UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LARCE SPIKES, | * | |
| Plaintiff | * | CIVIL DOCKET NUMBER: |
| | * | |
| VERSUS | * | |
| | * | |
| DR. CASEY MCVEA, NURSE | * | |
| LESLEY WHEAT, NURSE P. | * | |
| STRINGER, NURSE WENDY SEALS, | * | JUDGE: |
| NURSE R. BOWMAN | * | |
| | * | |
| Defendants. | * | MAG: |
| | * | |

*******************************

## COMPLAINT

**LARCE SPIKES**, a citizen of the state of Louisiana and formerly incarcerated at Rayburn Correctional Center, files this Complaint against the above-named defendants based on a failure to provide him with timely constitutionally adequate medical care during his time at Rayburn Correctional Center. Mr. **SPIKES** continues to suffer pain and limited movement in his right leg and hip as a result of the defendants' failure to provide appropriate medical care.

## I. JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. §§ 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the Fifth and Eighth Amendments to the Constitution of the United States, 42 U.S.C. § 1988 and 42 U.S.C. § 12205, et seq. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law, pursuant to 28 USC §1367.

1

## II. PARTIES

### (Plaintiff)

2.     **LARCE SPIKES** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled in New Orleans, Louisiana.

### (Defendants)

Named defendants herein are:

3.     **CASEY MCVEA**, in his individual capacity as Medical Director and primary medical provider at Rayburn Correctional Center, is an adult citizen of the State of Louisiana and domiciled in the State of Louisiana.  At all times described herein, he was Medical Director and primary medical provider at Rayburn Correctional Center and, as such, was responsible for the hiring, training, supervision, discipline, and control of the doctors, and nurses under his command as well as the for the medical care of all prisoners held at Rayburn Correctional Center. He was also treating physician for plaintiff.  At all times described herein, he was an employee of Rayburn Correctional Center and the Louisiana DOC and as such he was also responsible for the supervision, administration, policies, practices, customs, and medical operations of Rayburn Correctional Center.  He was and is a final policy maker and at all pertinent times he was acting under color of law.  He is liable both directly and vicariously for the actions complained of herein.

4.     **LESLEY WHEAT**, in her individual capacity, is an adult citizen of the State of Louisiana and domiciled in the State of Louisiana.  At all times described herein, she was a nurse at Rayburn Correctional Center and was responsible for the nursing care of

plaintiff.  At all times described herein, she was an employee of Rayburn Correctional Center.  She is liable directly for the actions complained of herein.

5.     **P. STRINGER** in her individual capacity, is an adult citizen of the State of Louisiana and domiciled in the State of Louisiana.  At all times described herein, she was a nurse at Rayburn Correctional Center and was responsible for the nursing care of plaintiff.  At all times described herein, she was an employee of Rayburn Correctional Center.  She is liable directly for the actions complained of herein.

6.     **WENDY SEALS**, in her individual capacity, is an adult citizen of the State of Louisiana and domiciled in the State of Louisiana.  At all times described herein, she was a nurse at Rayburn Correctional Center and was responsible for the nursing care of plaintiff.  At all times described herein, she was an employee of Rayburn Correctional Center.  She is liable directly for the actions complained of herein.

7.     **R. BOWMAN,** in her individual capacity, is an adult citizen of the State of Louisiana and domiciled in the State of Louisiana.  At all times described herein, she was a nurse at Rayburn Correctional Center and was responsible for the nursing care of plaintiff.  At all times described herein, she was an employee of Rayburn Correctional Center.  She is liable directly for the actions complained of herein.

### III. FACTUAL ALLEGATIONS

8.     From the end of June 2016 through the end of March 2017, **LARCE SPIKES** was subjected to nearly nine months of continuous deliberately indifferent medical care to a fractured hip. On June 30, 2016, plaintiff **LARCE SPIKES**, a forty-four-year-old man, experienced a sharp pain in his right groin and hip area while he was engaging in exercise at Rayburn Correctional Center.  He filed an emergency sick call and was seen

3

by LPN P. **STRINGER** under the supervision of Dr. **MCVEA**.  Nurse **STRINGER**

advised Mr. **SPIKES** that he had a pulled muscle.  Under the orders of Dr. **MCVEA**,

Nurse **STRINGER** ordered an analgesic balm for Mr. **SPIKES** to rub on his hip area.

9.     Five days later on July 5, 2016, Mr. **SPIKES** filed another emergency sick call

complaining of pain in his right groin, moving to his lateral thigh.  Mr. **SPIKES** was

brought to infirmary in a wheel chair.  Despite his reports of increased pain while

walking and his arrival at the infirmary in a wheel chair, Nurse **STRINGER** required

Mr. **SPIKES** to walk to the scale and noted that he was able to do so without assistance.

Nurse **STRINGER** noted muscle strain as the assessment and referred the chart to the

medical doctor.  She placed a note to continue ibuprofen and muscle rub as needed.

Nurse **STRINGER** advised Mr. **SPIKES** to just walk off the pain.

10.    The following day, July 6, 2016, Mr. **SPIKES** filed another emergency sick call

advising that he could not walk on his leg and described pain in his right hip radiating

down to his right knee.  The nurse under the supervision of Dr. **MCVEA** continued the

order for analgesic rub and ibuprofen.  The nurse also noted that Mr. **SPIKES** was

assigned a bottom bunk and crutches. The same day Dr. **MCVEA** placed Mr. **SPIKES**

on regular duty with restrictions, specifically a bottom bunk assignment and access to

crutches.

11.    After being told by medical staff, specifically Nurse **STRINGER**, nurse

**BOWMAN** and Nurse **WHEATON** that he would be written up for filing more

emergency sick calls about the pain in his leg, Mr. **SPIKES** filed a routine sick call on

July 14, 2016, complaining that he could not stand on his right leg.  Mr. **SPIKES** again

came to the infirmary in a wheel chair and reported an increase in pain during the

physical examination when Nurse **BOWMAN** pressed on Mr. **SPIKES's** hip.  Once again, the nurse sent the medical chart to the medical doctor and muscle rub was again ordered. The following day, July 15, 2016, Dr. **MCVEA** ordered Mr. **SPIKES** on to a temporary no duty status which was only to extend to July 19, 2016.  Nurse **BOWMAN** also advised Mr. **SPIKES** that his pain was caused by a strained muscle and to walk it off.

12.     On July 19, 2016, Mr. **SPIKES** again filed a routine sick call and was again brought to the infirmary in a wheelchair.  He requested that his no duty status be extended because he remained in significant pain and could not walk without crutches. Again, Nurse **BOWMAN** saw Mr. **SPIKES** and advised that he should not file additional sick calls and to walk off the pain.

13.     On July 20, 2016, Mr. **SPIKES** was seen again for an emergency sick call.  He was again brought to the infirmary via wheel chair.  Nurse **WHEAT** noted Mr. **SPIKES** had made repeated complaints about right groin pain.  Nurse **WHEAT** noted that Mr. **SPIKES** was given crutches for one week and advised not to participate in sports or lifting. Dr. **MCVEA** declined to extend Mr. **SPIKES'** no duty status and instead placed him on regular duty with a note that he could continue to use crutches.  No other relief was offered to Mr. **SPIKES**.

14.     The same day, Nurse **WHEAT** issued a disciplinary report, or write up, to Mr. **SPIKES** for "malingering" for filing multiple sick calls in his effort to receive care for what would ultimately diagnosed as fractured hip.  Mr. **SPIKES** never received a determination on this disciplinary report.  After this write up, and not wishing to loose

his privileges or good time, Mr. **SPIKES** simply tolerated the excruciating pain of his fractured hip while waiting for his scheduled doctor's appointment.

15.     On August 9, 2016, an assistant Warden spoke with Andrea Spikes, Mr. **SPIKES'** sister about her concerns regarding her brother's pain.  He advised her that he was scheduled to see the medical doctor on August 11, 2016.  Despite Mr. **SPIKES'** obvious continuing pain and difficulty walking, multiple sick calls for the same condition, and the concerns expressed by his family, none of the defendants made any effort to have Mr. **SPIKES** assessed by Dr. **MCVEA** on an expedited basis.

16.     On August 11, 2016, a month and half after he first reported the injury, Mr. **SPIKES** saw Dr. **MCVEA** on a doctor's call.  Dr. **MCVEA** noted Mr. **SPIKES** reported he could not stand or bend his right leg.  Dr. **MCVEA** ordered an x-ray and ordered Mr. SPIKES on to limited duty status with limited lifting, with assignment to a bottom bunk and two crutches.

17.     The x-ray revealed that Mr. **SPIKES** had a fracture to his right proximal femur, i.e., a fracture to his right hip.  Mr. **SPIKES** was ordered transferred to University Medical Center New Orleans (UMC) on August 11, 2016.

18.     At UMC, Mr. **SPIKES** was admitted to the hospital directly from the Emergency Department for surgery.  On August 15, 2016, he was taken for a four and half hour open reduction and internal fixation (ORIF) surgery to place a plate and dynamic hip screw (DHS).  Because of the extended delay between the facture and the surgery, the bones in Mr. **SPIKES'** hip had already started to heal together incorrectly and the surgeon was forced to re-fracture Mr. **SPIKES'** hip in order to properly reduce the hip and place the DHS and plate.

19.     On the morning of his discharge from UMC, Mr. **SPIKES** received assessments from a physical therapist and an occupational therapist.  The physical therapist provided close stand by assistance for Mr. **SPIKES** to ambulate with crutches.  The physical therapist made recommendations for mobility training, gait training, balance training, endurance training and a program of therapeutic exercises, requiring a plan to follow Mr. **SPIKES** for a minimum of three times per week.  The occupational therapist noted that for bed mobility / transfers Mr. **SPIKES** required assistance in rolling, supine to sitting and scooting activities. He was able to sit and stand with supervision.

20.     Upon his return from UMC, Mr. **SPIKES** once again experienced extensive delays in receiving essential medical care.  Despite UMC's discharge orders providing for physical and orthopedic therapy and his need for assistance as documented in UMC records, no such therapy or assistance was provided for him upon his return.  Mr. **SPIKES** did not receive even basic physical therapy exercises, did not receive any physical assistance in getting in and out of bed, and did not receive any coaching or instruction about how to get in and out of bed without disrupting his stitches. On information and belief, Mr. **SPIKES** was without crutches for nearly twenty-four hours after his return to Rayburn.

21.     Without basic mobility assistance, physical therapy exercises, and support, Mr. **SPIKES** remained largely immobile in the week following his surgery.  As a result of this immobility, on August 23, 2017, Mr. **SPIKES'** creatine kinase and myoglobin levels began to rise.  Creatine kinase is an enzyme and myoglobin is a protein; both are present when skeletal muscle is damaged and can increase when post-operative patients are not provided with information and support to promote tolerable physical exercise in

the days after surgery.  Mr. **SPIKES** received an intra venous (IV) saline drip on August 23, 2017 to address the increase of his creatine and myoglobin.

22.     On the evening of August 24, 2017, as he was attempting to navigate to the bathroom using crutches and the IV pole, Mr. **SPIKES** lost his balance and fell, tearing the IV out of his skin.  There was no nurse on the unit to assist him with moving to and from the bathroom or to offer coaching on how to move with the crutches and the IV pole.  There was no nurse on the unit to assist him after he fell.  In significant pain and without assistance, he had to find a way to raise himself off the floor with his crutches. Mr. **SPIKES** had to request an inmate worker who came onto the unit to collect meal trays to find a nurse to fix the torn IV line.  Nurse **WENDY SEAL**, responded and simply replaced the old IV dressing.  She noted that the IV dressing was re-secured, but failed to note that the IV leaked for the remainder of the evening.  The IV was ultimately removed the following day.

23.     The nurses tasked with Mr. **SPIKES** post-operative care, including **WENDY SEAL**, nurse **BOWMAN**, nurse **WHEAT**, and nurse **STRINGER** each did not provide constitutionally adequate care to assist Mr. **SPIKES** with tasks which the UMC physical and occupational therapist defined as requiring assistance or at the very least supervision.  Dr. **MCVEA** did not take any action to ensure that those nurses under his supervision provided appropriate assistance and supervision to Mr. **SPIKES** in his vulnerable post-operative state.

24.     In relatively young and healthy patients undergoing surgical operations to the hip, significant recovery, i.e., the ability to walk middle distances unaided without pain, is anticipated within four weeks with appropriate post-operative care.  Medical literature,

multiple randomized studies, and meta-analysis of randomized studies all support findings of the significant improvements in the speed and extent of patient recovery post-surgery with immediate access to physical therapy versus recovery times for patients with no physical therapy.  Despite this clear literature and the discharge orders from UMC for physical therapy, Dr. **MCVEA** did not make any arrangements for Mr. **SPIKES** to receive any physical therapy or even advise on basic range of motion and strengthening exercises for over five weeks after his surgery.   Through-out that five weeks, Mr. **SPIKES** continued to experience significant pain and stiffness in his right hip which was prolonged by the lack of constitutionally adequate post-operative care. Mr. **SPIKES** was eventually provided with a rudimentary course of physical therapy on September 22, 2016.  The harm in failing to provide timely access to even the most basic self-directed physical therapy is evident in the physical therapists' initial evaluation of Mr. **SPIKES**, noting significant deficits in Mr. **SPIKES'** range of motion and his reports of continuing pain many weeks after the surgery.

25.    The physical therapist ordered a follow up appointment for Mr. **SPIKES** on October 6, 2017. Dr. **MCVEA** accepted these orders with the change that Mr. **SPIKES** could use a cane.  Despite, accepting the remainder of the physical therapist's orders, Dr. **MCVEA** did not arrange for a follow up appointment with the physical therapist until October 20, 2017.

26.    Records from the October 20, 2016 appointment note that Mr. **SPIKES** adhered to the program plan outlined for him during the September 22, 2016 visit and experienced improvements to his hip mobility, though he did continue to experience pain while walking even with a mobility aid. Mr. **SPIKES** also had clear deficits to his

hip extension and posture.  The physical therapists' orders included a note to discontinue the straight cane and to evaluate Mr. **SPIKES'** progress with that change in a follow up appointment for November 3, 2016.  Dr. **MCVEA** accepted these orders without changes.

27.     On October 27, 2016, Mr. **SPIKES** was seen in the UMC orthopedics clinic for a follow up appointment, and returned to Rayburn with the orders to allow continued use of the straight cane as needed and to continue physical therapy to promote full return of range of motion and strength to his hip.  UMC also ordered a return in six weeks for x-rays to check the healing of Mr. **SPIKES'** right hip.  Dr. **MCVEA** also accepted these orders without any changes.  Despite the scheduled physical therapy appointment and UMC's orders to continue physical therapy, Dr. **MCVEA** did nothing to implement those orders, and Mr. **SPIKES** received no further physical therapy or follow up with UMC.

28.     Mr. **SPIKES** continued to engage in self-directed exercises to strengthen his hip to the best of his ability, but without the guidance of the physical therapist, he was ultimately forced to rely on the straight cane for an additional five months, only feeling strong enough to relinquish the cane in March 2017.  Currently, Mr. **SPIKES** continues to experience pain in his hip when lying down and he continues to suffer from limited mobility to his hip.

29.     The extensive delays in providing Mr. **SPIKES** with appropriate care, including delays to diagnose his fractured hip, refer him for surgery, and to provide him access appropriate post–operative care including physical therapy, all caused Mr. **SPIKES**

many months of unnecessary pain and have contributed to lingering symptoms from the hip fracture.

30.     The failure to provide constitutionally adequate medical care to Mr. **SPIKES** is also consistent with defendants' pattern and practice of failure to provide constitutionally adequate medical care in a timely fashion.

31.     Defendant Dr. **MCVEA** has been the subject of twenty-nine separate complaints by his patients in the previous five years.  These claims include specific allegations regarding the failure to provide constitutionally adequate medical care, including:

> a.  Joseph Dauzat had experienced fainting spells since December 2012 and fell while exercising at Rayburn in March 2013.  After repeated sick calls and requests to be seen by a specialist to assess his continued difficulty walking and numbness in his hands and feet, he was finally seen by Dr. **MCVEA** in early April and transferred to University Hospital.  Mr. Dauzat was diagnosed with severe stenosis of his cervical spine and recommended for surgery.  He eventually received the surgery in late April and was recommended for daily physical therapy to assist with his recover.  Dr. **MCVEA** only provided range of motion exercises but declined to provide the recommended physical therapy until a court ordered him to do so.

> b.  Travis Ware alleged that Dr. **MCVEA** touched his genitals inappropriately in the course of an exam in 2012.  Dr. **MCVEA** refused to refer Mr. Ware to another physician and Mr. Ware alleged that Dr. **MCVEA's** refusal amounted to retaliation against Mr. Ware

for raising the inappropriate touching and a failure to provide medical

care as Mr. Ware's condition remained untreated after the 2012 exam.

32.     Dr. Raman Singh, Medical Director for the Louisiana DOC, has specifically

commented on Dr. **MCVEA's** practiced avoidance of referring patients for outside

medical care and services, stating with approval that Dr. **MCVEA** has been "able to

handle many cases in-house that would otherwise have required a trip to the hospital."

*See* Cindy Chang, "Many doctors treating state's prisoners have disciplinary records

themselves", NOLA.com / The New Orleans *Times Picayune*, July 29, 2012, accessed at

*http://www.nola.com/crime/index.ssf/2012/07/many_doctors_treating_states_p.html*

(August 22, 2017).  Mr. **SPIKES**, Mr. Dauzat and Mr. Ware's care provide some insight

into the cost, measured in patient suffering, of Dr. MCVEA's insistence on handling the

majority of patient care in house.  As a result of this practice, Dr. MCVEA has created

conditions that subject that subject prisoners, including Mr. **SPIKES**, to unconstitutional

denials of medical care.

33.     At all times relevant to this complaint, defendants acted under color of state law.

34.     At all times mentioned herein, all the defendants named in their individual

capacities were employed by the Louisiana Department of Public Safety and Corrections

at the Rayburn Correctional Center, and where acting in the course and scope of their

employment with Louisiana Department of Corrections.

35.     All of the defendants are liable to the plaintiff for compensatory and punitive

damages.

36.     All the defendants are liable, jointly, severally, and in solido for the plaintiff's

injuries.

37.    The defendants' actions were willful, wanton and reckless and constitute a radical and substantial departure from accepted professional judgement, practice, and standards. Their actions consequently violated Mr. **SPIKES'** constitutional rights as a prisoner in the care of the defendants.  The defendants' actions were the proximate cause of the injuries and the damages sustained by plaintiff.

38.    Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of the plaintiff described herein, but failed to do so.

## IV. CAUSES OF ACTION

### COUNT 1:

### §1983 Violation Based on Establishment of a System in which Patients are Denied Access to Appropriate Medical Care

39.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

40.    The defendants named in this Complaint, acting individually and together, under color of law, acted to violated plaintiff's rights to due process and equal protection of the laws as protected by the Fifth and Eighth Amendments of the United States Constitution and 42 USC §1983.  They did so by establishing and maintaining a system that they knew would result in a lack of timely constitutionally adequate care effectively denying care to patients with serious medical conditions. Plaintiff was specifically and individually harmed by this system because it resulted in significant delays in medical treatment, thereby worsening plaintiff's condition and causing months of unnecessary and preventable pain and suffering.

41.    At all pertinent times, the defendants named in this Complaint, individually and collectively, substantially departed from accepted professional judgement, practice, and

standards, thereby violating Mr. **SPIKES'** constitutional and civil rights as an

involuntary committee in the care of the defendants by establishing the above-described

system.

## COUNT 2:

### §1983 Violation Based on Failure to Supervise Other Defendants to Ensure Patients Received Appropriate Care for Serious Medical Needs

42.     The defendants named in this Complaint, in their individual capacity, failed to

supervise their subordinates to ensure that these subordinates did not ignore patients'

requests and needs for medical treatment, including the need for proper medications,

diagnostic testing, and / or of providing unreasonable and patently insufficient treatment

for patients' conditions, and / or failing to properly provide monitoring and follow up

with patients who were treated, all of which caused serious pain, suffering, and injury.

43.     At all pertinent times herein, the defendants named in this Complaint were aware

of the need to supervise their subordinates in order to ensure that they did not violate

patients' rights, ignored that need and acted unreasonably, thereby substantially

departing from professional judgment.

## COUNT 3:

### §1983 Violation Based on Deliberate Indifference to Plaintiff's Constitutional Right to Appropriate Medical Care

44.     The above-named defendants, acting individually and together, and under color of

law, engaged in a course of conduct and conspired to engage in a course of conduct that

acted to deprive **LARCE SPIKES** of his constitutional rights and did deprive him of

said rights, specifically, the right to reasonable and adequate medical care, the right to be

free from cruel and unusual punishment, and the right to due process and equal

protection of the laws as protected by the Fifth and Eighth Amendments and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. § 1983.

45.    At all times pertinent herein, these defendants, acting individually and collectively, acted unreasonably, recklessly, maliciously, and substantially departed from standards of professional judgement so as to disregard the constitutional and civil rights and serious medical needs of the Plaintiff.  Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of **LARCE SPIKES**, as described herein, but failed to do so.

## COUNT 5:

### Negligent and / or Intentional Conduct Resulting in Injury

46.    State law Torts.  The above-named defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to plaintiff.  At all times pertinent herein, these defendants, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards the plaintiff.  Furthermore, these defendants, individually and collectively, had the duty and ability to intervene to prevent the tortious conduct of co-defendants toward plaintiff, as described herein, but failed to do so.  They are therefore liable to the plaintiff, as described herein.

## V. DAMAGES

47.    As a result of the above-described civil rights violations, plaintiff **SPIKES** suffered physical injuries, mental and emotional pain and suffering, anguish and distress,

embarrassment, humiliation, and possible medical expenses, all as will be determined at a trial of this matter.

## IV. PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that after due proceedings there be judgment rendered herein in plaintiff's favor and against all defendants individually and jointly, as follows:

1.    Compensatory and punitive damages as prayed for herein;

2.    Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988 and 42 U.S.C. § 12205, and all costs of these proceedings and legal interest;

3.    All other relief as appears just and proper to this Honorable Court.


Respectfully submitted,

/s/ Elizabeth Cumming
**ELIZABETH CUMMING (**Bar Roll No. 31685)
316 S. Dorgenois Street
New Orleans, LA 70119
(504) 822-4455 Telephone
(504) 822-4458 Fax
ecumminglaw@gmail.com


*Attorney for Plaintiff*