**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LARCE SPIKES,** **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 17-8164** |
| **DR. CASEY MCVEA, ET AL.,** **Defendants** | **SECTION: "E"(2)** |

## <u>ORDER AND REASONS</u>

Before the Court is a motion to dismiss filed by Defendants Dr. Casey McVea, Lesley Wheat, Wendy Seal, R. Bowman, and Paula Stringer pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] The motion is opposed.[2] For the reasons that follow, the Court **DENIES** the motion in part and **GRANTS** the motion in part.

## I. BACKGROUND[3]

Plaintiff Larce Spikes is a former inmate at Rayburn Correctional Center ("Rayburn"). He alleges his broken hip went misdiagnosed as a pulled muscle for forty-three days, and that after undergoing an operation to mend his hip, the medical staff at Rayburn failed to provide him proper medical treatment, thereby exacerbating and prolonging his pain. In total, Spikes alleges he was "subjected to nearly nine months of continuous deliberately indifferent medical care."[4]

On June 30, 2016, Spikes, who was forty-four years old at the time, "experienced a sharp pain in his right groin and hip area while he was engaging in exercise."[5] He then filed an emergency sick call and was seen by Defendant Paula Stringer, a nurse at

---

[1] R. Doc. 24.
[2] R. Doc. 31.
[3] The background is derived from Plaintiff's first amended complaint. R. Doc. 21.
[4] *Id.* at ¶ 8.
[5] *Id.*

Rayburn.[6] Nurse Stringer concluded Spikes had pulled a muscle, and she advised him to apply an analgesic balm.[7] Five days later, on July 5, 2016, Spikes filed a second emergency sick call "complaining of pain in his right groin, moving to his thigh," and was brought to the infirmary in a wheelchair.[8] Nurse Stringer again assessed Spikes' injury as a muscle strain.[9] She advised Spikes to continue taking ibuprofen and using muscle rub as needed. According to Spikes, Nurse Stringer told him to "just walk off the pain."[10]

On July 6, 2016, Spikes filed another emergency sick call. He informed the nurse on duty that he "could not walk on his leg and described pain in his right hip radiating down to his right knee."[11] The nurse told Spikes to continue using ibuprofen and muscle rub.[12] Dr. McVea placed Spikes "on regular duty with restrictions, specifically a bottom bunk assignment and access to crutches."[13] Nurse Stringer, Nurse Bowman, and Nurse Wheat all warned Spikes that "he would be written up for filing more emergency sick calls."[14]

On July 14, 2016, Spikes again was brought to the infirmary in a wheelchair "complaining that he could not stand on his right leg."[15] Nurse Bowman told Spikes that his pain was caused by a strained muscle, again prescribing muscle rub, and telling Spikes to "walk it off."[16] The following day, July 15, 2016, Dr. McVea ordered Spikes on to a temporary "no duty" status for four days.[17] On July 19, 2016, the day before his temporary

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.* at ¶ 9.
[11] *Id.* at ¶ 10.
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶ 11.
[15] *Id.*
[16] *Id.*
[17] *Id.*

no duty status ended, Spikes returned to the infirmary in a wheelchair. He requested his no duty status be extended, as "he remained in significant pain and could not walk without crutches."[18] Dr. McVea did not extend Spikes' no duty status, and instead placed him on regular duty with a note that he could continue to use crutches.[19] "No other relief was offered to Mr. Spikes,"[20] and Nurse Bowman warned him not to file additional sick calls. He was again instructed to simply walk off the pain.[21]

The next day, on July 20, 2016, Spikes made another emergency sick call and was brought to the infirmary in a wheelchair.[22] Nurse Wheat noted Spikes' repeated complaints regarding his hip, and issued a disciplinary report, citing Spikes for "malingering."[23] According to Spikes, this write up caused him to "simply tolerate[] the excruciating pain of his fractured hip while waiting for his scheduled doctor's appointment," out of fear that he would "lose his privileges or good time" if he complained.[24]

On August 9, 2016, Spikes' sister, Andrea Spikes, spoke to an assistant warden regarding Spikes' injury.[25] The assistant warden advised Ms. Spikes that her brother had an appointment scheduled for August 11, 2016 and that his issues would be addressed at that time.[26] Dr. McVea examined Spikes' hip for the first time during this August 11 appointment. Dr. McVea "noted Mr. Spikes reported he could not stand or bend his right leg" and "ordered an x-ray."[27] Thereafter, Dr. McVea placed Spikes on "limited duty"

---

[18] *Id.* at ¶ 12.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at ¶ 13.
[23] *Id.* at ¶ 14.
[24] *Id.*
[25] *Id.* at ¶ 15.
[26] *Id.*
[27] *Id.* at ¶ 16.

status with "limited lifting," and ordered that Spikes be moved to the bottom bunk and given two crutches.[28]

The x-ray revealed Spikes had "a fracture to his right proximal femur."[29] As a result of this x-ray, Spikes was transferred to University Medical Center New Orleans ("UMC") on August 11, 2016.[30]

On August 15, 2016, Spikes underwent a four and half hour open reduction and internal fixation ("ORIF") surgery to implant a plate and dynamic hip screw ("DHS").[31] According to Spikes, "because of the extended delay between the facture and the surgery, the bones in [his] hip had already started to heal together incorrectly," and "the surgeon was forced to re-fracture Spikes' hip in order to properly reduce the hip and place the DHS and plate."[32]

Spikes received assessments from a physical therapist and an occupational therapist on the morning of his discharge from UMC. The physical therapist made recommendations for "mobility training, gait training, balance training, endurance training and a program of therapeutic exercises," and required Spikes to follow the program for a minimum of three times per week.[33] The occupational therapist noted that for bed mobility and transfers, Spikes would require assistance in rolling, supine to sitting, and scooting activities.[34]

---

[28] *Id.*
[29] *Id.* at ¶ 17.
[30] *Id.*
[31] *Id.* at ¶ 19.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Spikes alleges that once he returned to Rayburn following his operation, he again experienced "extensive delays in receiving essential medical care."[35] "Despite UMC's discharge orders providing for physical and orthopedic therapy and his need for assistance as documented in UMC records, no such therapy or assistance was provided for him upon his return."[36] Spikes did not receive physical therapy exercises or physical assistance in getting in and out of bed, and did not receive any coaching or instruction about how to get in and out of bed without disrupting his stitches.[37] Spikes went without crutches for nearly twenty-four hours upon his return to Rayburn.[38]

Spikes remained largely immobile in the week following his surgery. He alleges this period of inactivity "caused detrimental metabolic changes."[39] On August 23, 2017, Spikes' creatine kinase and myoglobin levels began to rise.[40] According to the complaint, "Creatine kinase is an enzyme and myoglobin is a protein; both are present when skeletal muscle is damaged and can increase when post-operative patients are not provided with information and physical support to promote tolerable physical exercise in the days after surgery."[41] As a result of this rise in his creatine kinase and myoglobin levels, Spikes required an intra venous (IV) saline drip on August 23, 2017.[42]

On the evening of August 24, 2017, Spikes tried to use the bathroom. He was forced to travel to the bathroom unsupervised, as Nurse Seal had "abandoned" Spikes in the course of her shift, "creating a substantial risk" that Spikes might fall.[43] "[A]s he was

---

[35] *Id.* at ¶ 20.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.* at ¶ 21.
[40] *Id.* at ¶ 23.
[41] *Id.*
[42] *Id.*
[43] *Id.* at ¶ 24.

attempting to navigate to the bathroom using crutches and the IV pole, Mr. Spikes lost his balance and fell, tearing the IV out of his skin."[44] Because there was no nurse on the unit to assist him after he fell, Spikes "had to find a way to raise himself off the floor with his crutches," and "had to request an inmate worker who came onto the unit to collect meal trays to find a nurse to fix the torn IV line."[45] Nurse Seal eventually assisted Spikes and "simply replaced the old IV dressing." Although she noted in Spikes' chart that the IV dressing was resecured, "the IV leaked for the remainder of the evening."[46]

Spikes did not receive any physical therapy or guidance regarding basic range of motion and strengthening exercises until September 22, 2016, more than five weeks after his surgery.[47] The physical therapist noted "significant deficits in Mr. Spikes' range of motion and his reports of continuing pain many weeks after the surgery."[48] The physical therapist ordered a follow up appointment for Mr. Spikes on October 6, 2017,[49] which Dr. McVea "accepted with the change that Mr. Spikes could use a cane."[50] However, Dr. McVea did not arrange for a follow up appointment with the physical therapist until October 20, 2017.[51] Records from the October 20, 2016 appointment reflect that Spikes "adhered to the program plan outlined for him during the September 22, 2016 visit and experienced improvements to his hip mobility, though he did continue to experience pain while walking even with a mobility aid."[52] The physical therapist also noted Spikes "had clear deficits to his hip extension and posture."[53] The physical therapist recommended

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.* at ¶ 26.
[48] *Id.*
[49] *Id.* at ¶ 27.
[50] *Id.*
[51] *Id.*
[52] *Id.* at ¶ 28.
[53] *Id.*

Spikes discontinue the use of the straight cane and noted that he would reevaluate Spikes' progress with that change in a follow up appointment for November 3, 2016.[54] "Dr. McVea accepted these orders without changes."[55]

On October 27, 2016, Spikes was seen in the UMC orthopedics clinic for a follow up appointment, and returned to Rayburn with the orders to allow continued use of the straight cane as needed and to continue physical therapy to promote full return of range of motion and strength to his hip.[56] UMC doctors also ordered Spikes to return in six weeks for an x-ray to monitor how his hip was healing.[57] "Dr. McVea accepted these orders without any changes."[58] However, Spikes received no further physical therapy and was not brought in for follow up with UMC.[59]

On August 23, 2017, Spikes filed a complaint in federal district court. In his complaint, Spikes brings three § 1983 claims and a state law claim for intentional infliction of emotional distress against Defendants, each in their individual capacities.[60] With respect to Dr. McVea, Spikes brings claims based on 42 U.S.C. § 1983, alleging Dr. McVea violated his Eighth Amendment right to be free from cruel and unusual punishment by: (1) establishing unconstitutional procedures and policies related to

---

[54] *Id.*
[55] *Id.*
[56] *Id.* at ¶ 29.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] The Court notes that in his first amended complaint, Spikes alleges Defendants' conduct violated both his Fifth and Eighth Amendment rights. In his opposition to Defendants' motion to dismiss, however, Spikes concedes that his claims based on the Fifth Amendment must be dismissed. R. Doc. 31 at 1 ("Plaintiff notes that because he was a sentenced prisoner during the relevant time period, he will agree to a stipulation that his claims are only brought pursuant to the Eighth Amendment of the United States Constitution, not the Fifth Amendment.").

inmate access to appropriate medical care, (2) failing to train and supervise his subordinates, and (3) being deliberately indifferent to Spikes' serious medical needs.[61]

With respect to Nurse Wheat, Spikes brings claims against her pursuant to § 1983, alleging Nurse Wheat violated his Eighth Amendment right to be free from cruel and unusual punishment by: (1) failing to train and supervise her subordinates, and (2) being deliberately indifferent to Spikes' serious medical needs.[62] Spikes also brings a state law based claim for intentional infliction of emotional distress against Nurse Wheat pursuant to Louisiana Civil Code article 2315.[63]

With respect to the remaining Defendants—Nurse Stringer, Nurse Bowman, and Nurse Seal—Spikes brings claims arising under: (1) 42 U.S.C. § 1983, alleging these nurses acted with deliberate indifference to his severe medical needs in violation of the Eighth Amendment of the U.S. Constitution; and (2) Louisiana Civil Code article 2315, alleging the nurses intentionally caused Spikes emotional distress.[64]

On January 22, 2018, Defendants filed a motion to dismiss Spikes' claims, arguing that they are entitled to qualified immunity.[65]

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief.[66] "To survive a motion to dismiss, a complaint must contain sufficient

---

[61] R. Doc. 21 at 15, 16, 18; R. Doc. 26 at 1–2.
[62] R. Doc. 21 at 15, 16, 18; R. Doc. 26 at 1–2.
[63] R. Doc. 21 at 19; R. Doc. 26 at 2.
[64] R. Doc. 21 at 19; R. Doc. 26 at 2.
[65] R. Doc. 24 at 3.
[66] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[67] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[68] However, the court does not accept as true legal conclusions or mere conclusory statements,[69] and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[70] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[71]

"Factual allegations must be enough to raise a right to relief above the speculative level."[72] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."[73]

When considering a qualified immunity defense raised in the context of a Rule 12(b)(6) motion to dismiss, the Court must determine whether "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity."[74] "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."[75]

---

[67] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).
[68] *Id.*
[69] *Id.*
[70] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).
[71] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).
[72] *Twombly*, 550 U.S. at 555.
[73] *Id.* (quoting FED. R. CIV. P. 8(a)(2)).
[74] *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012); *Jordan v. City of New Orleans*, No. 15-1922, 2016 WL 633666, at *2 (E.D. La. Feb. 17, 2016).
[75] *Backe*, 691 F.3d at 648; *see also Babb v. Dorman*, 33 F.3d 472, 475 n.5 (5th Cir. 1994) ("To survive a motion to dismiss in cases where the qualified immunity defense is raised, a plaintiff must state facts, which

The qualified immunity defense serves to shield government officials, sued in their individual capacities and performing discretionary functions, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[76] "A court required to rule upon the qualified immunity issue must [first] consider" whether, taken in the light most favorable to the plaintiff, "the facts alleged show the officer's conduct violated a constitutional right."[77] "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."[78] If the complaint makes out a constitutional violation, the Court then must determine whether that constitutional right was clearly established at the time the violation occurred.[79] To be "clearly established" for the purpose of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[80]

Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[81] For a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"[82] "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

---

if proven, would defeat the defense."); *Jackson v. City of Beaumont Police Dep't*, 958 F.2d 616, 620 (5th Cir. 1992).

[76] *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004).

[77] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[78] *Id.*

[79] *Id.*

[80] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[81] *White v. Pauly*, 137 S. Ct. 548, 549 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

[82] *Id.*

violates that right."[83] "Officials should receive the protection of qualified immunity 'unless the law is clear in the more particularized sense that reasonable officials should be put on notice that their conduct is unlawful.'"[84] "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[85] "The court's focus, for purposes of the 'clearly established' analysis should be on 'fair warning': qualified immunity is unavailable 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[86]

## III. ANALYSIS

Spikes brings three § 1983 claims based on Defendants' alleged violations of his Eighth Amendment rights and a state law claim for intentional infliction of emotional distress. Because the viability of Spikes' Eighth Amendment claims depend on whether he has sufficiently alleged Defendants acted with deliberate indifference, the Court begins its analysis with Spikes' third § 1983 claim—that all five Defendants violated the Eighth Amendment's prohibition on cruel and unusual punishment when they acted with deliberate indifference to Spikes' serious medical needs—before considering Plaintiff's claims against Dr. McVea for failure to train and supervise and establishing unconstitutional policies and practices at Rayburn, and Plaintiff's claims against Nurse Wheat for failure to train and supervise. Finally, the Court considers whether Spikes has stated an actionable claim for intentional infliction of emotional distress against Nurse

---

[83] *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Anderson*, 483 U.S. at 640).
[84] *Id.* at 393 (quoting *Kinney*, 367 F.3d at 350).
[85] *White*, 137 S. Ct. at 549.
[86] *Wernecke*, 591 F.3d at 392 (5th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Wheat, Nurse Stringer, Nurse Bowman, and Nurse Seal pursuant to Louisiana Civil Code article 2315.

**A. Spikes has stated an actionable Eighth Amendment claim against Defendants for their alleged deliberate indifference to his serious medical needs**

Spikes alleges Defendants acted with deliberate indifference to his severe medical needs in violation the Eighth Amendment by: (1) failing to provide "timely access to a qualified medical provider," (2) failing to provide timely access to "appropriate diagnostic tests," (3) threatening to write Spikes up in an attempt "to impede his access to adequate medical care," and (4) delaying and failing to provide "adequate post-operative care consistent with the post-operative treatment plan."[87] According to Spikes, "Defendants Stringer, Bowman, Wheat, and Seal all subjectively knew of and effectively disregarded a substantial risk to Mr. Spikes' health when they opted to make their own diagnosis, successfully impeded Mr. Spikes' access to a physician qualified to diagnose his hip for close to a month and a half, and failed to provide adequate postoperative care to Mr. Spikes."[88] With respect to Dr. McVea, Spikes submits that "[d]espite his direct knowledge of Mr. Spikes' serious and escalating symptoms of pain, Dr. McVea failed to evaluate or refer Mr. Spikes for basic diagnostic testing for over a month and half" and then "failed to ensure even the most basic post-operative care in the form of nursing support or physical therapy to facilitate Mr. Spikes' healing."[89]

In their motion to dismiss, Defendants argue Spikes' allegations fall "well short of the high standard of deliberate indifference."[90] According to Defendants, "Plaintiff seems

---

[87] R. Doc. 31 at 13.
[88] *Id.* at 14.
[89] *Id.* at 19.
[90] R. Doc. 24-1 at 10.

to be mixing the law of qualified immunity and medical malpractice," and that "a disagreement among medical personnel is not a sufficient basis for deliberate indifference."[91] Thus, Defendants argue, even if Spikes has stated a claim for medical malpractice, he has not sufficiently alleged each of the elements necessary to state a claim of deliberate indifference.[92] Defendants submit that, because Spikes' allegations fall short of a claim for deliberate indifference, they are entitled to qualified immunity.[93]

The Eighth Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, proscribes the government's implementation of cruel and unusual punishment.[94] It is well-established that prison officials inflict cruel and unusual punishment when they are deliberately indifferent to an inmate's serious medical needs.[95] Thus, if the Court concludes Defendants acted with deliberate indifference to Spikes' serious medical needs, Defendants' invocation of qualified immunity must be denied.[96]

"For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[97] To state a cognizable claim for relief under this standard, a prisoner must satisfy two requirements: "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"[98]  Second, a plaintiff

---

[91] *Id.* at 12.
[92] *Id.* at 14.
[93] *Id.* at 3–5.
[94] *Victoria W. v. Larpenter*, 369 F.3d 475, 483 (5th Cir. 2004).
[95] *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).
[96] *See White*, 137 S. Ct. at 549.
[97] *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).
[98] *Farmer*, 511 U.S. at 834 (quotation omitted); *see also Cooper v. Johnson*, 353 F. App'x 965, 967 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

must establish that the defendant possessed a culpable state of mind.[99] A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[100] "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[101]

In this case, Spikes alleges Defendants' repeated failure to properly diagnose his broken hip for over a month despite his repeated and escalating complaints, and failure to provide him with any post-operation physical rehabilitation for six weeks after his hip surgery amounts to deliberate indifference.

### 1. Nurse Defendants

Spikes submits the Defendant nurses ignored his deteriorating condition and independently diagnosed him without authorization, thereby preventing Spikes from being evaluated by a medical professional capable of properly diagnosing his condition. In support of his argument, he points to the Eleventh Circuit's holding in *Mandel v. Doe*[102] and the Fifth Circuit's holding in *Rodrigue v. Moorehouse Detention Center*.[103] In both cases, the circuit court concluded that conduct similar to the conduct alleged in this case satisfied the Eighth Amendment's two requirements—that the deprivation be "sufficiently

---

[99] *Farmer*, 511 U.S. at 834.
[100] *Id.* at 837.
[101] *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009); *see also Bohannan v. Doe*, No. 12-10231, 2013 WL 2631197, at *6 (5th Cir. June 12, 2013) (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).
[102] 888 F.2d 783 (11th Cir. 1989).
[103] No. 09-cv-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012), *aff'd sub. nom. Rodrigue v. Grayson*, 557 F. App'x 341 (5th Cir. 2014).

serious" and that the defendants contributed to the deprivation with a culpable state of mind.[104]

In *Mandel*, the Eleventh Circuit upheld the district court's denial of the county's motion for a directed verdict on the issue of whether the defendant physician and physician's assistants acted with deliberate indifference to an inmate's serious medical needs when the inmate's broken hip went misdiagnosed as a muscle strain for three months.[105] The plaintiff in *Mandel* felt a sharp pain in his left leg and hip while working on a prison crew.[106] Despite the inmates repeated complaints of extreme discomfort, the physician's assistants continued to prescribe the inmate muscle relaxants and bed rest. Following a jury trial, the jury returned a verdict in favor of the inmate. The defendants entered a motion for judgment notwithstanding the verdict on the issue of deliberate indifference, which the district court denied. On appeal, the Eleventh Circuit upheld the district court's finding that the physician's assistants' actions and inactions constituted deliberate indifference to the inmate's serious medical need, explaining that "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."[107]

The Fifth Circuit came to a similar conclusion in *Rodrigue v. Moorehouse Detention Center*.[108] In *Rodrigue*, the Fifth Circuit upheld the district court's finding that a licensed practical nurse's failure to refer an inmate to the prison's medical doctor despite his severe medical need constituted deliberate indifference. The Fifth Circuit explained:

---

[104] *See Farmer*, 511 U.S. at 834.
[105] 888 F.2d at 783. The court explained that the inmate's injury took place on July 1, 1982, and that his broken hip went undiagnosed until after his release from prison in September 1982. *Id.* at 785–86.
[106] *Id.* at 785.
[107] *Id.* at 789 (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *West v. Keve*, 571 F.2d 158, 162 (3rd Cir. 1978)).
[108] 557 F. App'x at 341.

[I]t is important to specify that the question is not whether Nurse Grayson is liable for failing to recognize that Rodrigue had acute appendicitis. As previously discussed, a LPN is not authorized to make a diagnosis. However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care. LPN Grayson knew that Rodrigue's complaints showed that he was at risk of serious harm. She simply decided not to respond to that risk. This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision. . . . In this case, despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week, a prisoner was simply denied access to a medical professional competent to diagnose and treat his condition. The Court is convinced that this conduct rose to the level of a wanton disregard for Rodrigue's serious medical needs. . . . When a gatekeeper to emergency care, like LPN Grayson, knowingly disregards a prisoner's complaints, she acts with deliberate indifference to that prison's medical needs.[109]

In this case, Spikes alleges the nurse Defendants acted as gate-keepers to his access to a medical professional competent to diagnose and treat his serious medical condition. Like the nurses in *Rodrigue*, the Defendant nurses in this case are not authorized to diagnose an inmate's medical condition.[110] Because these nurses are not authorized to diagnose Spikes' injury, the Defendant nurses "must be able to know when there is a risk of a serious condition that requires additional care."[111] Construing Spikes' allegations as true, despite Spikes' frequent emergency medical calls, which consistently increased in severity, and his repeatedly having to be transported to the infirmary in a wheelchair, the nurses repeatedly and erroneously concluded Spikes' broken hip was a muscle strain, provided him with muscle rub, and told him to simply "walk it off." Moreover, instead of

---

[109] *Id.*

[110] *See* La. R.S. 37:913(13) ("'Practice of nursing' means the performance, with or without compensation, by an individual licensed by the board as a registered nurse, of functions requiring specialized knowledge and skills derived from the biological, physical, and behavioral sciences. The practice of nursing or registered nursing shall not be deemed to include acts of medical diagnosis or medical prescriptions of therapeutic or corrective nature."); *Shields v. Dogencorp, LLC*, No. 16-1826, 2016 WL 6892889, at *4 (E.D. La. Nov. 23, 2016) ("Under La. R. S. 37:913(13), a license to practice nursing does not qualify a nurse to render medical diagnosis or opine on medical causation.") (citing *Dade v. Clayton*, No. 12-0680, 2012 U.S. Dist. LEXIS 152285, at *16, 2012 WL 5288005 (W.D. La. Oct. 23, 2012)).

[111] *Rodrigue*, 557 F. App'x at 341.

interpreting Spikes' inability to walk and persistent complaints as indicative of a serious medical need, the Defendant nurses threatened Spikes with disciplinary action for "malingering."[112]

Spikes' repeated emergency medical calls and his physical deterioration made his need for treatment obvious. The nurse Defendants "knew [Spikes'] complaints showed that he was at risk of serious harm," but "simply decided not to respond to that risk."[113] Although the nurse Defendants provided Spikes with muscle rub and ibuprofen, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."[114] Like the Eleventh Circuit in *Mandel* and the Fifth Circuit in *Rodrigue*, this Court is "convinced that this conduct rose to the level of a wanton disregard for [Spikes'] serious medical needs," and therefore finds Spikes has made out an actionable Eighth Amendment claim against the nurse Defendants.

Defendants argue the Court must evaluate each Defendants' subjective deliberate indifference separately, citing *Lawson v. Dallas County*.[115] The Fifth Circuit in *Lawson* was evaluating the sufficiency of the evidence against each Defendant following a jury trial and the benefit of a thorough discovery process. At the motion to dismiss stage, however,

> Identification of a responsible party or parties within a complex, overlapping chain of command is often a difficult task. Numerous variables must be factored into the analysis: the amount of information known to various defendants; the scope of their duties and authority; their training and expertise; the allocation of decision making power within the organization; reporting and review relationships; established and formal decision making procedures; and informal custom and practice. All of this can be sorted-out. . . . But, given the complexity of this analysis, [plaintiffs]

---

[112] R. Doc. 12 at ¶ 14.
[113] 557 F. App'x at 341.
[114] *Id.* at 789 (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)); *see also West*, 571 F.2d at 162.
[115] 286 F.3d 257, 262 (5th Cir. 2002).

should not be penalized at [this] stage for failing to identify precisely which defendant or defendants dropped the ball.[116]

In this case, Spikes alleges facts showing each of Defendants' actions and inactions contributed to Spikes' alleged injury. He alleges the nurse Defendants: (1) failed to identify his serious medical need; (2) misdiagnosed his condition as a muscle strain, effectively preventing him from being seen by Dr. McVea; (3) threatened him with disciplinary action should he make any further emergency sick calls; and (4) failed to monitor and assist him after he underwent surgery. To dismiss an individual Defendant at this stage would be premature.

In sum, the Court concludes that Spikes has pleaded facts that, if taken as true, reveal the nurse Defendants' "wanton disregard for [his] serious medical needs."[117] As a result, the Court finds Spikes has stated a violation of a clearly established Eighth Amendment right against the nurse Defendants for their deliberate indifference to Spikes' serious medical needs and concludes the nurse Defendants are not entitled to qualified immunity as to this claim.

### 2. Dr. McVea

Next, Spikes argues Dr. McVea was aware of his serious and escalating medical condition but nevertheless failed to evaluate Spikes for over a month and half after Spikes broke his hip. According to Spikes, the allegation that Dr. McVea had knowledge of Spikes' severe medical need, but nevertheless failed to evaluate Spikes for six weeks sufficiently states a claim for deliberate indifference.

---

[116] *Hernandez v. Horn*, No. 09-163, 2010 WL 1525513, at *10 (S.D. Tex. Apr. 15, 2010) (citing *Shaw ex rel. Strain v. Strackhouse*, 920 F.2d 1135, 1149–50 (3d Cir. 1990)).
[117] *Brewster*, 587 F.3d at 770.

In support of this claim, Spikes points to *Thompson v. Ackal*.[118] In *Thompson*, the plaintiff alleged the defendant doctor was "aware that [the plaintiff] was a 16 year-old with a diagnosed mental disorder (ADHD) which required prescription medication, who was being held in an adult facility," and that despite this knowledge, the doctor provided the plaintiff with prescription medication, without first personally examining him, obtaining his medical records related to the medication, or speaking with the plaintiff about his condition.[119] The district court denied the defendant's motion for summary judgment, explaining that "[b]ased on the foregoing allegations, Plaintiff has alleged a plausible claim that [the defendant's] treatment of [the plaintiff] without ever examining him or his medical records constituted deliberate indifference.[120]

In his complaint, Spikes alleges Dr. McVea was aware that Spikes had a serious medical need, but nevertheless failed to timely evaluate or treat him and instead allowed the nurse Defendants to treat Spikes' broken hip with muscle rub. In substantiating the allegation that Dr. McVea had knowledge of Spikes' medical need, Spikes points to the nurse Defendants' referral of Spikes' chart to Dr. McVea and the changes Dr. McVea authorized to Spikes' duty status. According to Spikes, despite his direct knowledge of Mr. Spikes' serious and escalating symptoms of pain, Dr. McVea failed to evaluate or refer Spikes for basic diagnostic testing for over a month and half.

After Spikes underwent surgery, he alleges Dr. McVea failed to ensure even the most basic post-operative care in the form of nursing support or physical therapy to ensure Spikes' hip healed properly. According to Spikes, Dr. McVea "accepted without

---

[118] *Thompson v. Ackal*, No. 15-2288, 2016 WL 1394352, at *12 (W.D. La. Mar. 9, 2016), *adopted as modified by* No. 15-2288, 2016 WL 1391047 (W.D. La. Apr. 6, 2016).

[119] *Id.*

[120] *Id.* (citing *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 924 (7th Cir. 2008); *Davis v. Puryear*, 673 So.2d 1298 (La. App. 4 Cir. 1996)).

change" Spikes' physical therapist's orders that Spikes undergo physical therapy and return to the hospital for a follow-up appointment, but failed to implement the these orders, causing Spikes prolonged pain and deficient healing process.[121] Accepting these allegations as true and making all inferences in Spikes' favor, the Court concludes Spikes has stated a plausible claim for relief against Dr. McVea. Moreover, because the Court concludes Spikes has sufficiently alleged Dr. McVea acted with deliberate indifference to his serious medical needs, Dr. McVea is not entitled to qualified immunity as to this claim.[122]

### B. Spikes has stated an actionable Eighth Amendment claim against Dr. McVea for allegedly establishing unconstitutional policies and procedures to access to appropriate medical care

Spikes alleges McVea violated his Eighth Amendment right to be free from cruel and unusual punish by (1) "fail[ing] to ensure patients with serious medical complaints were referred to a physician for appropriate treatment"; (2) "substantially limit[ing] access to outside hospital care"; (3) "fail[ing] to ensure orders for post-operative care were implemented and followed by nurses under his direction"; and (4) "fail[ing] to ensure adequate staffing to provide necessary medical supervision and physical assistance to vulnerable post-operative patients."[123] According to Spikes, Dr. McVea's conduct in

---

[121] R. Doc. 21 at ¶¶ 21–23. *See Dauzat v. Carter*, 670 F. App'x 297, 298 (5th Cir. 2016) ("The district court did not err in denying Dr. McVea's motion to dismiss based on the court's determination that Dauzat stated an Eighth Amendment claim and that a reasonable physician in Dr. McVea's position would understand that the failure to provide physical therapy as ordered violated Dauzat's clearly established constitutional right."); *Baker v. Wilkinson*, 635 F. Supp. 2d 514, 521 (W.D. La. 2009) (finding deliberate indifference when prison doctor's "inexpert course of treatment supplanted course of treatment recommended by expert medical opinion").

[122] *Farmer*, 511 U.S. at 834; *see also Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) ("Since *Estelle v. Gamble*, state officials have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.").

[123] R. Doc. 21 at ¶ 43.

establishing these allegedly unconstitutional procedures allowed Spikes' condition to worsen, thereby "causing months of unnecessary and preventable pain and suffering."[124]

In his motion to dismiss, Dr. McVea first argues "it is well established that, in general, no defendant in . . . a [§ 1983] suit can be held liable under any theory of vicarious liability."[125] Dr. McVea further argues Spikes has not pleaded that Dr. McVea "has adopted or perpetuated any policy of untimely or inadequate medical care"; rather, Dr. McVea contends Spikes' alleges "only that this was the practical effect of [the Defendant nurses'] negligence in his case."[126] Finally, Dr. McVea submits that for Spikes to make out an actionable claim, he must "[a]t a minimum . . . plead facts showing that multiple incidents have occurred under similar circumstances because of a policy or practice."[127]

Although generally a supervisory official may not be held liable for the actions of his subordinates under any theory of respondeat superior simply because his subordinate allegedly violated an inmates constitutional rights,[128] a policymaker may be subject to § 1983 liability for the failure to promulgate constitutionally adequate policies and procedures.[129] The Fifth Circuit detailed the circumstances under which a policymaker may be subject to § 1983 liability in *Rhyne v. Henderson County*.[130] The court explained:

> A municipal "policy" must be a deliberate and conscious choice by a municipality's policy-maker. While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight. The Supreme Court has held that municipal failure to adopt a

---

[124] *Id.*
[125] R. Doc. 24-1 at 17 (citing *Iqbal*, 556 U.S. at 677).
[126] *Id.* at 18.
[127] *Id.*
[128] *See Alton v. Tex. A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999).
[129] *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992); *see Doe v. Rains Cty. Indep. Sch. Dist.*, 66 F.3d 1402, 1412 (5th Cir. 1995).
[130] 973 F.2d at 392.

policy does not constitute such an intentional choice unless it can be said to have been "deliberately indifferent."[131]

Moreover, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[132]

In this case, Spikes alleges that as Rayburn's Medical Director, Dr. McVea is responsible for establishing appropriate medical procedures at the Rayburn facility.[133] Spikes alleges Dr. McVea has either failed to establish or has established inadequate procedures for the timely diagnoses of inmates' serious medical conditions and that Dr. McVea should have known that his practice of failing to timely assess and diagnose patients with ongoing complaints presented a significant risk of violating the constitutional rights of his patients.[134]

Accepting Spikes' allegations as true, Rayburn has no policy or has an inadequate policy in place for inmates with ongoing and escalating complaints to be referred to a medical doctor competent to assess and diagnose their serious medical needs. The "likely consequences" in the absence of such a policy is for inmates with severe medical needs to go undiagnosed for an unreasonable amount of time. In this case, Spikes suffered from a broken hip for forty-three days before being seen by Dr. McVea, despite repeated visits to the infirmary to which he was brought in a wheelchair and his complaints of increasingly severe pain. Thus, the Court concludes Dr. McVea's failure to promulgate a policy under which inmates with lingering, serious medical needs are seen by a medical professional

---

[131] *Id.* (internal citations omitted) (citing *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989); *Manarite v. City of Springfield*, 957 F.2d 953, 959 (1st Cir. 1992)).
[132] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotations omitted).
[133] R. Doc. 21 at ¶¶ 3, 22.
[134] R. Doc. 31 at 24.

competent to diagnose and treat the inmates' serious medical needs in a timely manner amounts to deliberate indifference, as it is obvious that the likely consequences of not adopting such a policy will be a deprivation of an inmate's Eighth Amendment right to be free from cruel and usual punishment.[135]

Moreover, the allegations in Spikes' amended complaint make clear that Spikes' experience at the Rayburn facility under Dr. McVea's care is not an isolated incident. According to Spikes, Dr. McVea "has been the subject of twenty-nine separate complaints by his patients in the previous five years" and that complaints against him "include specific allegations regarding the failure to provide constitutionally adequate medical care."[136] In support of this assertion, among other specific instances of alleged deliberate indifference, Spikes points to Dr. McVea's treatment of Joseph Duzant.[137] Spikes alleges Duzant, like Spikes, fell and severely injured himself while exercising at Rayburn. "After repeated sick calls and requests to be seen by a specialist to assess his continued difficulty walking and numbness in his hands and feet, [Duzant] was finally seen by Dr. MCVEA [a month after the accident] and transferred to University Hospital."[138] According Spikes, Duzant underwent back surgery and his surgeon recommended he received daily physical therapy. Despite this recommendation, Spikes alleges, Dr. McVea "only provided range of motion exercises but declined to provide the recommended physical therapy until a court ordered him to do so."[139] Dr. McVea's alleged handling of Duzant's case is strikingly similar to the case at bar. As a result, the Court concludes Spikes has made allegations sufficient to make out an Eighth Amendment claim against Dr. McVea for establishing a

---

[135] 973 F.2d at 392.
[136] R. Doc. 21 at ¶¶ 33–35.
[137] *Id.* at ¶ 34(a).
[138] *Id.*
[139] *Id.*

policy or practice in which inmates' serious medical needs at Rayburn go unaddressed by a competent medical professional, and that this policy or lack thereof results in the infliction of cruel and unusual punishment to which Dr. McVea was deliberately indifferent.

As the Court explained *supra*, because Spikes has made sufficient allegations of Dr. McVea's deliberate indifference to inmates' serious medical needs, and in light of the Fifth Circuit's holding in *Rhyne v. Henderson County*,[140] the Court rejects Dr. McVea's assertion of the qualified immunity defense as to this claim.

### C. Spikes has stated an actionable Eighth Amendment claim against Dr. McVea and Nurse Wheat for failure to train and supervise

Spikes alleges Dr. McVea and Nurse Wheat failed to train and supervise their subordinates "to ensure that these subordinates did not ignore patients' requests and needs for medical treatment, including the need for proper medications, diagnostic testing, and/or of providing unreasonable and patently insufficient treatment for patients' conditions, and/or failing to properly provide monitoring and follow up with patients who were treated, all of which caused serious pain, suffering, and injury."[141] He submits that Dr. McVea and Nurse Wheat's failure to train and supervise the nursing staff working under them violated Spikes' Eighth Amendment right to be free from cruel and unusual punishment.

In their motion to dismiss, Defendants again argue that Dr. McVea and Nurse Wheat cannot be held liable under any theory supervisory liability absent some personal involvement.[142] Further, Defendants submit "Plaintiff has not pled that Dr. McVea or

---

[140] 973 F.2d at 392.
[141] R. Doc. 21 at ¶ 45.
[142] R. Doc. 24-1 at 17–18.

Nurse Wheat have adopted or perpetuated any policy of untimely or inadequate medical care, only that this was the practical effect of their negligence in his case and that of his example of Mr. Dauzat."[143]

A supervisory official may not be held liable for the actions of his subordinates under any theory of respondeat superior simply because subordinate allegedly violated an inmates constitutional rights.[144] However, although a claim arising under § 1983 "requires a degree of causation as an element of individual liability," "it does not specifically require 'personal participation.'"[145] For example, if "a supervisory official breache[s] a state-law duty with deliberate indifference toward a resulting constitutional injury, he [has] misused the state authority conferred on him to supervise and control his subordinates."[146] Essentially, "[a] supervisor's failure to act, coupled with his deliberate indifference, [i]s tantamount to a conscious decision to allow[] the alleged constitutional injury to occur or persist."[147]

When a "state official [i]s responsible for preventing the constitutional injury[,] his failure to do so render[s] him directly liable for the deprivation that his subordinate perpetrated."[148] Thus, when a state law imposes a duty to supervise a subordinate, and the defendant breaches that duty with deliberate indifference to the potential constitutional violations his failure to supervise might cause, the defendant may be held liable for any damages that result from this failure, even if the supervisory official was not

---

[143] *Id.*
[144] *See Alton*, 168 F.3d at 200.
[145] *Rains*, 66 F.3d at 1412.
[146] *Id.* at 1413.
[147] *Id.*
[148] *Id.*

directly involved in the subordinate's unconstitutional actions. As the Fifth Circuit explained in *Doe v. Rains County Independent School District*:

> This conclusion obtains because the state official was responsible for preventing the constitutional injury; his failure to do so rendered him directly liable for the deprivation that his subordinate perpetrated. Such a supervisory official is liable under § 1983 not because he committed a distinct constitutional violation by breaching his duty to supervise, but because his failure to control his subordinate rendered him responsible for the resulting subordinate misconduct—essentially, he was a legal participant.[149]

To state an actionable claim for failure to supervise under § 1983 in this context, a plaintiff must allege: (1) "the [supervisor] failed to supervise or train the [subordinate]," (2) "a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights," and (3) "such failure to supervise or train amounted to gross negligence or deliberate indifference."[150]

### 1. Dr. McVea

In this case, Spikes has made out an actionable § 1983 claim against Dr. McVea for his failure to train and supervise the nurses working under him. Pursuant to Louisiana Revised Statutes § 37:913 and 37:961(4), physicians such as Dr. McVea have a legal duty to supervise the registered nurses and licensed practical nurses who work under them.[151] Thus, Dr. McVea was ultimately responsible for Spikes' treatment at the Rayburn facility and Dr. McVea had the legal authority and duty to supervise the nursing staff at Rayburn. Spikes alleges that (1) despite this duty, Dr. McVea entirely failed to supervise the nurse

---

[149] *Id.*

[150] *Id.* at 1412–13 (quoting *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986)); *see Billops v. Sandoval*, 401 F. Supp. 2d 766, 772–74 (N.D. Tex. 2005) (applying *Rains* in the context of a prison doctor's failure to train and supervise subordinate nurses); *see also Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir. 1982); *Douthit v. Jones*, 641 F.2d 345, 346–47 (5th Cir. 1981); *Barksdale v. King*, 699 F.2d 744, 746–48 (5th Cir. 1983).

[151] LA. REV. STATS. §§ 37:913, 37:961(4).

Defendants' treatment of Spikes, and thus he was deliberately indifferent to Spikes' care; and (2) Dr. McVea's deliberate indifference to Spikes' serious medical condition caused Spikes to suffer with a broken hip for over a month.

Despite Spikes' reports of "worsening symptoms and pain for over a month and a half," Dr. McVea failed to personally evaluate Spikes, and "this failure resulted in the constitutional violation that led to the failure to timely treat Plaintiff's fractured hip."[152] Specifically,

> the repeated diagnostic activity of LPNs Bowman and Stringer, in diagnosing Mr. Spikes' hip pain as muscle strain without an independent examination by a physician competent to make a diagnostic decision reflects Dr. McVea's near complete abdication of his responsibility to supervise LPNs working for him. Further, Dr. McVea's failure to ensure nurses Seal, Bowman, Wheat, and Stringer were providing adequate supervision and assistance to Mr. Spikes in his vulnerable post-operative state consistent with the recommendations from UMC demonstrated Dr. McVea's failure to supervise nurses.[153]

The Court finds these allegations meet the pleading requirements the Fifth Circuit articulated in *Rains*.[154] As a result, the Court finds Spikes has articulated a violation of a clearly established constitutional right and therefore concludes Dr. McVea is not entitled to qualified immunity as to this claim.[155]

### 2. Nurse Wheat

Spikes alleges that Nurse Wheat, in her capacity as Program Director at Rayburn Correctional Center, "was responsible for promulgating policies and practices to ensure nurses under her supervision received orders for and maintained appointments with

---

[152] R. Doc. 31 at 22.
[153] *Id.*
[154] *Rains*, 66 F.3d at 1412; *see Billops*, 401 F. Supp. 2d at 772–74.
[155] *See Rains*, 66 F.3d at 1408–15; *see also Farmer*, 511 U.S. at 834; *Austin*, 328 F.3d at 210; *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n.12 (5th Cir. 1994) (en banc) ("Deliberate indifference will often be a fact-laden question.").

outside specialists."[156] Spikes also alleges that as Program Director, Nurse Wheat was "in a position to receive follow up orders from outside specialists and would have been responsible for promulgating practices and policies to ensure nurses under her supervision provided medically necessary care in accordance with those orders." Finally, Spikes argues Nurse Wheat "was in a position to . . . ensure nurses under her supervision did not retaliate against patients whose serious medical needs were not addressed by triage nurses."[157] Thus, taking Spikes' allegations as true, Nurse Wheat had the duty and legal authority to supervise the nursing staffs' treatment of Spikes at Rayburn.

Spikes argues that, despite her duty to supervise the nurse Defendants, Nurse Wheat failed to do so, and that this failure lead to the constitutionally inadequate medical care Spikes received at Rayburn. The Court concludes these allegations meet the pleading requirements articulated in *Rains*. Spikes alleges: (1) Nurse Wheat had a duty to supervise Nurse Stringer, Nurse Bowman, and Nurse Seal; (2) Nurse Wheat's failure to supervise the subordinate nurses resulted in Spikes' receiving constitutionally inadequate medical care; and (3) Nurse Wheat's failure to supervise amounts to deliberate indifference, as the logical result of her failure to supervise was for patients to receive constitutionally inadequate care.[158] Moreover, the Court finds Spikes has articulated a violation of a clearly established constitutional right and therefore concludes Nurse Wheat is not entitled to qualified immunity as to this claim.[159]

---

[156] R. Doc. 31 at 23.
[157] *Id.*
[158] *See Rains*, 66 F.3d at 1412–13.
[159] *Id.* at 1408–15; *see also Farmer*, 511 U.S. at 834; *Austin*, 328 F.3d at 210; *Taylor Indep. Sch. Dist.*, 15 F.3d at 456 n.12 ("Deliberate indifference will often be a fact-laden question.").

### D. Spikes has stated an actionable claim against Nurse Wheat, Nurse Stringer, Nurse Bowman, and Nurse Seal pursuant to Louisiana Civil Code article 2315

As an initial matter, the Court notes that, although Defendants ostensibly seek dismissal of *all* claims against them, at no point in their motion to dismiss do Defendants argue Spikes has failed to state a claim pursuant to Louisiana Civil Code article 2315. In fact, in their motion to dismiss, Defendants fail to acknowledge the allegation. To the extent Defendants seek dismissal of this claim, the Court denies the motion.

The Louisiana Supreme Court has held that the tort of intentional infliction of emotional distress occurs when a person "by extreme and outrageous conduct intentionally causes severe emotional distress to another."[160] To recover for intentional infliction of emotional distress under Louisiana law, a plaintiff must demonstrate (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.[161] "Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous."[162]

In this case, Spikes alleges Defendants were deliberately indifferent to his serious medical needs. Given the high threshold for deliberate indifference, and because the Court has already concluded the nurse defendants acted with deliberate indifference to Spikes' severe and worsening condition, the Court finds the first element, that the alleged conduct be extreme and outrageous, is met in this case. The nurses, despite Spikes repeated complaints and obvious need for medical attention, failed to treat Spikes or refer

---

[160] *See White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).
[161] *Id.*
[162] *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1025 (La. 2000).

him to Dr. McVea for evaluation, and instead threatened him with disciplinary action should he make additional emergency medical calls. This placed Spikes in the position of either "tolerat[ing] the excruciating pain of his fractured hip," or as he describes in his complaint, risking the loss of "his privileges or good time."[163] The Court finds such conduct "extreme and outrageous."

Next, Spikes alleges he "suffered physical injuries, mental and emotional pain and suffering, anguish and distress, embarrassment, humiliation," as a result of the Defendant nurses' conduct.[164] Finally, the severity of plaintiff's emotional distress and defendants desire to inflict emotional distress is, "a fact-driven subjective inquiry into the states of mind of [Plaintiff] and [Defendant], and cannot be resolved on summary judgment," let alone on a motion to dismiss.[165] As a result the Court denies Defendants' motion to dismiss as to this claim.

**CONCLUSION**

Accordingly;

**IT IS ORDERED** that Defendants Dr. Casey McVea, Lesley Wheat, Wendy Seal, R. Bowman, and Paula Stringer's motion to dismiss is **GRANTED** in part and **DENIED** in part.[166] With respect to Plaintiff's 42 U.S.C. § 1983 claims based on violations of the Eighth Amendment and claims based on Louisiana Civil Code article 2315, the motion is **DENIED**. With respect to Plaintiff's 42 U.S.C. § 1983 claims based on violations of the Fifth Amendment, the motion is **GRANTED**.

---

[163] R. Doc. 21 at ¶ 15.
[164] *Id.* at ¶ 57.
[165] *Greenwell v. Raytheon Aerospace, Inc.*, No. 95-2138, 1996 WL 63093, at *2–3 (E.D. La. Feb. 13, 1996).
[166] R. Doc. 24.

**IT IS ORDERED** Plaintiff's claims against Defendants based on the Fifth Amendment are hereby **DISMISSED WITH PREJUDICE**.

**New Orleans, Louisiana, this 7th day of May, 2018.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**