# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| LARCE SPIKES, | CIVIL ACTION |
| Plaintiff | |
| VERSUS | NO. 17-8164 |
| DR. CASEY MCVEA, ET AL., | SECTION: "E"(2) |
| Defendants | |

## ORDER AND REASONS

Before the Court is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and Rule 12(b)(6) filed by Defendants Dr. Casey McVea, Lesley Wheat, Wendy Seal, R. Bowman, and Paula Stringer.[1] The motion is opposed.[2] For the reasons that follow, the Court **DENIES** the motion in part and **GRANTS** the motion in part.

## I. BACKGROUND[3]

Plaintiff Larce Spikes is a former inmate at Rayburn Correctional Center ("Rayburn"). He alleges his broken hip went misdiagnosed as a pulled muscle for forty-three days, and that after undergoing an operation to mend his hip, the medical staff at Rayburn failed to provide him proper medical treatment, thereby exacerbating and prolonging his pain. In total, Spikes alleges he was "subjected to nearly nine months of continuous deliberately indifferent medical care."[4]

On June 30, 2016, Spikes, who was forty-four years old at the time, "experienced a sharp pain in his right groin and hip area while he was engaging in exercise."[5] He then filed an emergency sick call and was seen by Defendant Paula Stringer, a nurse at

---

[1] R. Doc. 41.
[2] R. Doc. 42.
[3] The background is derived from Plaintiff's first amended complaint. R. Doc. 21.
[4] *Id.* at ¶ 8.
[5] *Id.*

1

Rayburn.[6] Nurse Stringer concluded Spikes had pulled a muscle, and she advised him to apply an analgesic balm.[7] Five days later, on July 5, 2016, Spikes filed a second emergency sick call "complaining of pain in his right groin, moving to his thigh," and was brought to the infirmary in a wheelchair.[8] Nurse Stringer again assessed Spikes' injury as a muscle strain.[9] She advised Spikes to continue taking ibuprofen and using muscle rub as needed. According to Spikes, Nurse Stringer told him to "just walk off the pain."[10]

On July 6, 2016, Spikes filed another emergency sick call. He informed the nurse on duty that he "could not walk on his leg and described pain in his right hip radiating down to his right knee."[11] The nurse told Spikes to continue using ibuprofen and muscle rub.[12] Dr. McVea placed Spikes "on regular duty with restrictions, specifically a bottom bunk assignment and access to crutches."[13] Nurse Stringer, Nurse Bowman, and Nurse Wheat all warned Spikes that "he would be written up for filing more emergency sick calls."[14]

On July 14, 2016, Spikes again was brought to the infirmary in a wheelchair "complaining that he could not stand on his right leg."[15] Nurse Bowman told Spikes that his pain was caused by a strained muscle, again prescribing muscle rub, and telling Spikes to "walk it off."[16] The following day, July 15, 2016, Dr. McVea ordered Spikes on to a temporary "no duty" status for four days.[17] On July 19, 2016, the day before his temporary no duty status ended, Spikes returned to the infirmary in a wheelchair. He requested his

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.* at ¶ 9.
[11] *Id.* at ¶ 10.
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶ 11.
[15] *Id.*
[16] *Id.*
[17] *Id.*

no duty status be extended, as "he remained in significant pain and could not walk without crutches."[18] Dr. McVea did not extend Spikes' no duty status, and instead placed him on regular duty with a note that he could continue to use crutches.[19] "No other relief was offered to Mr. Spikes,"[20] and Nurse Bowman warned him not to file additional sick calls. He was again instructed to simply walk off the pain.[21]

The next day, on July 20, 2016, Spikes made another emergency sick call and was brought to the infirmary in a wheelchair.[22] Nurse Wheat noted Spikes' repeated complaints regarding his hip, and issued a disciplinary report, citing Spikes for "malingering."[23] According to Spikes, this write up caused him to "simply tolerate[] the excruciating pain of his fractured hip while waiting for his scheduled doctor's appointment," out of fear that he would "lose his privileges or good time" if he complained.[24]

On August 9, 2016, Spikes' sister, Andrea Spikes, spoke to an assistant warden regarding Spikes' injury.[25] The assistant warden advised Ms. Spikes that her brother had an appointment scheduled for August 11, 2016 and that his issues would be addressed at that time.[26] Dr. McVea examined Spikes' hip for the first time during this August 11 appointment. Dr. McVea "noted Mr. Spikes reported he could not stand or bend his right leg" and "ordered an x-ray."[27] Thereafter, Dr. McVea placed Spikes on "limited duty"

---

[18] *Id.* at ¶ 12.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at ¶ 13.
[23] *Id.* at ¶ 14.
[24] *Id.*
[25] *Id.* at ¶ 15.
[26] *Id.*
[27] *Id.* at ¶ 16.

3

status with "limited lifting," and ordered that Spikes be moved to the bottom bunk and given two crutches.[28]

The x-ray revealed Spikes had "a fracture to his right proximal femur."[29] As a result of this x-ray, Spikes was transferred to University Medical Center New Orleans ("UMC") on August 11, 2016.[30]

On August 15, 2016, Spikes underwent a four and half hour open reduction and internal fixation ("ORIF") surgery to implant a plate and dynamic hip screw ("DHS").[31] According to Spikes, "because of the extended delay between the facture and the surgery, the bones in [his] hip had already started to heal together incorrectly," and "the surgeon was forced to re-fracture Spikes' hip in order to properly reduce the hip and place the DHS and plate."[32]

Spikes received assessments from a physical therapist and an occupational therapist on the morning of his discharge from UMC. The physical therapist made recommendations for "mobility training, gait training, balance training, endurance training and a program of therapeutic exercises," and required Spikes to follow the program for a minimum of three times per week.[33] The occupational therapist noted that for bed mobility and transfers, Spikes would require assistance in rolling, supine to sitting, and scooting activities.[34]

---

[28] *Id.*
[29] *Id.* at ¶ 17.
[30] *Id.*
[31] *Id.* at ¶ 19.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Spikes alleges that once he returned to Rayburn following his operation, he again experienced "extensive delays in receiving essential medical care."[35] "Despite UMC's discharge orders providing for physical and orthopedic therapy and his need for assistance as documented in UMC records, no such therapy or assistance was provided for him upon his return."[36] Spikes did not receive physical therapy exercises or physical assistance in getting in and out of bed, and did not receive any coaching or instruction about how to get in and out of bed without disrupting his stitches.[37] Spikes went without crutches for nearly twenty-four hours upon his return to Rayburn.[38]

Spikes remained largely immobile in the week following his surgery. He alleges this period of inactivity "caused detrimental metabolic changes."[39] On August 23, 2017, Spikes' creatine kinase and myoglobin levels began to rise.[40] According to the complaint, "Creatine kinase is an enzyme and myoglobin is a protein; both are present when skeletal muscle is damaged and can increase when post-operative patients are not provided with information and physical support to promote tolerable physical exercise in the days after surgery."[41] As a result of this rise in his creatine kinase and myoglobin levels, Spikes required an intra venous (IV) saline drip on August 23, 2017.[42]

On the evening of August 24, 2017, Spikes tried to use the bathroom. He was forced to travel to the bathroom unsupervised, as Nurse Seal had "abandoned" Spikes in the course of her shift, "creating a substantial risk" that Spikes might fall.[43] "[A]s he was

---

[35] *Id.* at ¶ 20.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.* at ¶ 21.
[40] *Id.* at ¶ 23.
[41] *Id.*
[42] *Id.*
[43] *Id.* at ¶ 24.

attempting to navigate to the bathroom using crutches and the IV pole, Mr. Spikes lost his balance and fell, tearing the IV out of his skin."[44] Because there was no nurse on the unit to assist him after he fell, Spikes "had to find a way to raise himself off the floor with his crutches," and "had to request an inmate worker who came onto the unit to collect meal trays to find a nurse to fix the torn IV line."[45] Nurse Seal eventually assisted Spikes and "simply replaced the old IV dressing." Although she noted in Spikes' chart that the IV dressing was resecured, "the IV leaked for the remainder of the evening."[46]

Spikes did not receive any physical therapy or guidance regarding basic range of motion and strengthening exercises until September 22, 2016, more than five weeks after his surgery.[47] The physical therapist noted "significant deficits in Mr. Spikes' range of motion and his reports of continuing pain many weeks after the surgery."[48] The physical therapist ordered a follow up appointment for Mr. Spikes on October 6, 2017,[49] which Dr. McVea "accepted with the change that Mr. Spikes could use a cane."[50] However, Dr. McVea did not arrange for a follow up appointment with the physical therapist until October 20, 2017.[51] Records from the October 20, 2016 appointment reflect that Spikes "adhered to the program plan outlined for him during the September 22, 2016 visit and experienced improvements to his hip mobility, though he did continue to experience pain while walking even with a mobility aid."[52] The physical therapist also noted Spikes "had clear deficits to his hip extension and posture."[53] The physical therapist recommended

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.* at ¶ 26.
[48] *Id.*
[49] *Id.* at ¶ 27.
[50] *Id.*
[51] *Id.*
[52] *Id.* at ¶ 28.
[53] *Id.*

Spikes discontinue the use of the straight cane and noted that he would reevaluate Spikes' progress with that change in a follow up appointment for November 3, 2016.[54] "Dr. McVea accepted these orders without changes."[55]

On October 27, 2016, Spikes was seen in the UMC orthopedics clinic for a follow up appointment, and returned to Rayburn with the orders to allow continued use of the straight cane as needed and to continue physical therapy to promote full return of range of motion and strength to his hip.[56] UMC doctors also ordered Spikes to return in six weeks for an x-ray to monitor how his hip was healing.[57] "Dr. McVea accepted these orders without any changes."[58] However, Spikes received no further physical therapy and was not brought in for follow up with UMC.[59]

On August 23, 2017, Spikes filed a complaint in federal district court. In his complaint, Spikes brings three § 1983 claims and a state law claim for intentional infliction of emotional distress against Defendants, each in their individual capacities.[60] With respect to Dr. McVea, Spikes brings claims based on 42 U.S.C. § 1983, alleging Dr. McVea violated his Eighth Amendment right to be free from cruel and unusual punishment by: (1) establishing unconstitutional procedures and policies related to inmate access to appropriate medical care, (2) failing to train and supervise his subordinates, and (3) being deliberately indifferent to Spikes' serious medical needs.[61]

---

[54] *Id.*
[55] *Id.*
[56] *Id.* at ¶ 29.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.* at 15, 16, 18; R. Doc. 26 at 1–2.

With respect to Nurse Wheat, Spikes brings claims against her pursuant to § 1983, alleging Nurse Wheat violated his Eighth Amendment right to be free from cruel and unusual punishment by: (1) failing to train and supervise her subordinates, and (2) being deliberately indifferent to Spikes' serious medical needs.[62] Spikes also brings a state law based claim for intentional infliction of emotional distress against Nurse Wheat pursuant to Louisiana Civil Code article 2315.[63]

With respect to the remaining Defendants—Nurse Stringer, Nurse Bowman, and Nurse Seal—Spikes brings claims arising under: (1) 42 U.S.C. § 1983, alleging these nurses acted with deliberate indifference to his severe medical needs in violation of the Eighth Amendment of the U.S. Constitution; and (2) Louisiana Civil Code article 2315, alleging the nurses intentionally caused Spikes emotional distress.[64]

On January 22, 2018, Defendants filed a motion to dismiss Spikes' claims, arguing that they are entitled to qualified immunity.[65] On May 7, 2018, the Court denied Defendants' motion, finding Spikes had alleged violations of a clearly established constitutional right.[66] On June 5, 2018, Defendants filed the instant motion to dismiss.[67] In this motion, Defendants seek dismissal of Plaintiff's state law based claims and all claims arising from events that took place before August 23, 2016.[68] Defendants first argue Plaintiff's state law claims must be dismissed under Rule 12(b)(1), as these claims are barred by the Eleventh Amendment of the U.S. Constitution.[69] Defendants next

---

[62] R. Doc. 21 at 15, 16, 18; R. Doc. 26 at 1–2.
[63] R. Doc. 21 at 19; R. Doc. 26 at 2.
[64] R. Doc. 21 at 19; R. Doc. 26 at 2.
[65] R. Doc. 24 at 3.
[66] R. Doc. 40. The Court granted Defendants' motion to the extent Spikes brought claims pursuant to the Fifth Amendment. *See id.* at 7 n.60.
[67] R. Doc. 41.
[68] *Id.* at 1.
[69] *Id.*

8

contend Spikes' claims relating to events that took place prior to August 23, 2016 have prescribed and should be dismissed under Rule 12(b)(6).[70]

## II.    LEGAL STANDARD

### A. Dismissal under Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims."[71] A motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) challenges a federal court's subject-matter jurisdiction.[72] Under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[73] "Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts."[74] Thus, in examining a Rule 12(b)(1) motion, the district court is empowered to consider factual matters that may be in dispute.[75] "When, as here, grounds for dismissal may exist under both Rule 12(b)(1) and Rule 12(b)(6), the Court should, if necessary, dismiss only under the former without reaching the question of failure to state a claim."[76]

---

[70] *Id.*
[71] *In re FEMA Trailer Formaldehyde Products Liab. Litig. (Mississippi Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012).
[72] *See* FED. R. CIV. P. 12(b)(1).
[73] *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted).
[74] *In re FEMA*, 668 F.3d at 287.
[75] *Crane v. Johnson*, 783 F.3d 244, 251 n.21 (5th Cir. 2015); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).
[76] *Valdery v. Louisiana Workforce Comm'n*, No. 15-01547, 2015 WL 5307390, at *1 (E.D. La. Sept. 10, 2015).

## B. Dismissal under Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief.[77] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[78] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[79] However, the court does not accept as true legal conclusions or mere conclusory statements,[80] and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[81] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[82] "Factual allegations must be enough to raise a right to relief above the speculative level."[83] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."[84]

---

[77] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).
[78] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).
[79] *Id.*
[80] *Id.*
[81] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).
[82] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).
[83] *Twombly*, 550 U.S. at 555.
[84] *Id.* (quoting FED. R. CIV. P. 8(a)(2)).

## III. ANALYSIS

Spikes brings three § 1983 claims based on Defendants' alleged violations of his Eighth Amendment rights and a state law claim for intentional infliction of emotional distress. In their second motion to dismiss, Defendants argue Spikes' state law claim must be dismissed as barred by the Eleventh Amendment and that Spikes' claims based on events that occurred prior to August 23, 2016 have prescribed. The Court evaluates each argument in turn.

### A. Spikes' State Law Claims are Barred by the Eleventh Amendment

Defendants contend this Court lacks jurisdiction to consider Spikes' claims brought pursuant to Louisiana Civil Code article 2315 for intentional infliction of emotional distress. According to Defendants, "these claims cannot remain part of this suit because Spikes' claims under state law are directly related to Defendants' carrying out their official duties and responsibilities for which the State of Louisiana has, by statute, provided for indemnification."[85] In opposition, Spikes points out that he brings his state law claims against Defendants in their individual capacities,[86] and that, therefore, "[t]he relief sought is monetary relief, which may be sought from each defendants' own pocket[s]."[87] Thus, Spikes submits, his "state law claims against individual Defendants cannot automatically be considered as claims against the state,"[88] and, therefore, jurisdiction is proper in this case.[89]

---

[85] R. Doc. 41-1 at 3.
[86] R. Doc. 42 at 9.
[87] *Id.* at 10.
[88] *Id.* at 9.
[89] *Id.* at 11.

It is well established that the Eleventh Amendment prohibits a citizen of a state from filing suit against his own state, state agency or department.[90] When the state is the "real, substantial party in interest," the Eleventh Amendment also serves as a bar to state law based suits against state officials.[91] "In determining whether the state is the real or substantial party in interest, courts have analyzed whether the decision rendered would (1) operate against the sovereign, (2) expend itself on the public treasury, (3) interfere with public administration, or (4) compel the state to act or refrain from acting."[92]

Although the Eleventh Amendment does not provide an automatic bar to state law claims asserted against a state official in his or her personal capacity, when the state employee would be entitled to indemnification by the state for claims arising under state law, such state law claims may not be brought in federal court.[93] The relevant question in assessing an Eleventh Amendment immunity defense is whether the relief the plaintiff seeks operates against the state.[94]

In this case, Defendants are entitled to indemnification from the State of Louisiana pursuant to Louisiana Revised Statutes section 13:5108.1, which provides:

> The state shall defend and indemnify a covered individual against any claim, demand, suit, complaint, or petition seeking damages filed in any court over alleged negligence or other act by the individual, including any demand under any federal statute when the act that forms the basis of the cause of action took place while the individual was engaged in the performance of duties of the individual's office, employment with the state, or engaged in

---

[90] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 555 (5th Cir. 1988); *Voisin's Oyster House v. Guidry*, 799 F.2d 183, 185 (5th Cir. 1986).
[91] *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Hughes v. Savell*, 902 F.2d 376, 377 (5th Cir. 1990).
[92] *Guillory v. La. Dep't of Health & Hosps.*, No. 16-787, 2018 WL 1404277, at *18 (M.D. La. Mar. 20, 2018) (slip copy) (citing *Pennhurst*, 465 U.S. at 101; *Dugan v. Rank*, 372 U.S. 609, 620 (1963); *Voisin's Oyster House*, 799 F.2d at 188).
[93] *Reyes v. Sazan*, 168 F.3d 158 (5th Cir. 1999).
[94] *See New Orleans Towing Ass'n v. Foster*, 248 F.3d 1143, at *5 (5th Cir. 2001) (unpublished); *Reyes*, 168 F.3d at 163; *Hughes*, 902 F.2d at 378).

the provision of services on behalf of the state or any of its departments pursuant to Paragraph (E)(2) of this Section.[95]

Spikes does not allege Defendants were engaged in criminal conduct, the only circumstance under which this statute would not provide indemnity to Defendants.[96] If Defendants are found liable to Spikes for violations of Louisiana Civil Code 2315, they will be entitled to indemnification from the State of Louisiana. Because a successful claim will ultimately expend itself on the public treasury, Spikes' state law claims operate against the State.[97] As a result, the Court **DISMISSES** Spikes' claims against Defendants brought pursuant to Louisiana Civil Code article 2315, as barred by the Eleventh Amendment.

### B. Spikes' Claims Based on Conduct That Occurred Before August 23, 2016 Have Not Prescribed

Defendants next contend Spikes' claims based on conduct that occurred before August 23, 2016, one year prior to the filing of this action,[98] have prescribed.[99] Section 1983 cases are governed by the prescriptive period for personal injury actions of the state in which the conduct occurred.[100] Wrongs committed by Louisiana state officials in violation of a plaintiff's constitutional rights are subject to the one-year prescriptive period for Louisiana tort actions.[101] However, to determine when a plaintiff's cause of action *accrues*, the Court must reference federal law.[102] "Federal law holds generally that an action accrues when a plaintiff has a complete and present cause of action, or,

---

[95] La. Rev. Stat. § 13:5108.1
[96] *Id.*
[97] *Guillory*, 2018 WL 1404277, at *18.
[98] *See* R. Doc. 1.
[99] R. Doc. 41-1 at 5.
[100] *Wilson v. Garcia*, 471 U.S. 261 (1985); *Jones v. Orleans Parish Sch. Bd.*, 688 F.2d 342, 344 (5th Cir. 1982) ("It is well established in decisions in this Circuit that wrongs committed by Louisiana state officials in violation of federal law are considered to be torts subject to the one-year prescriptive period.").
[101] *Watts v. Graves*, 720 F.2d 1416, 1423 (5th Cir. 1983).
[102] *Heath v. Bd. of Supervisors for the S. Univ. and Agric. and Mech. Coll.*, 850 F.3d 731, 740 (5th Cir. 2017); *Walker v. Epps*, 550 F.3d 407, 414 (5th Cir. 2008).

expressed differently, when the plaintiff can file suit and obtain relief."[103] The prescriptive period begins to run "the moment the plaintiff becomes aware that [he] has suffered an injury or has sufficient information to know that [he] has been injured."[104]

According to Defendants, Spikes' allegations that Defendants violated his Eighth Amendment rights by failing to timely diagnose and treat his broken hip must be dismissed, as Spikes underwent hip surgery at the University Medical Center on August 15, 2016, more than one year prior to filing the instant suit.[105] Thus, Defendants argue, Spikes may bring only his § 1983 claims against Defendants based on the allegation that he did not receive constitutionally adequate rehabilitative treatment post-surgery.[106]

In opposition, Spikes does not dispute that a one-year prescriptive period applies to his section 1983 claims.[107] Spikes argues, however, that his claims have not prescribed because they are subject to the "continuous violation doctrine," and, because Defendants' wrongful acts were repeated over time, "[a]ll of these actions individually and in combination caused and prolonged serious harm to Mr. Spikes."[108] Thus, according to Spikes, the prescriptive period did not begin to run "until damaging conduct cease[d]."[109] The last harmful act alleged by Spikes was that he was "seen in the UMC orthopedics clinic for a follow up appointment" on October 27, 2016 and "returned to Rayburn with the orders to allow continued use of the straight cane as needed and to continue physical therapy to promote full return of range of motion and strength to his hip."[110] Spikes

---

[103] *Walker*, 550 F.3d at 414 (citing *Wallace v. Kato*, 549 U.S. 384 (2007)) (internal quotation marks omitted).
[104] *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)).
[105] *Id.* at 7.
[106] *Id.*
[107] R. Doc. 42 at 5.
[108] *Id.* at 7.
[109] *Id.* at 8.
[110] R. Doc. 21 at ¶¶ 29–31.

14

alleges that after his October 27, 2016 appointment, Defendants "failed schedule a follow up appointment to return [him] to the orthopedic clinic" and "failed to schedule and maintain physical therapy appointments," which resulted in Spikes' "rely[ing] on the straight cane for an additional five months, only feeling strong enough to relinquish the cane in March 2017."[111] According to Spikes, the prescriptive period on his § 1983 claims did not begin to accrue until that date, and thus his complaint filed on August 23, 2017 was timely as to all the alleged wrongful acts.[112]

The statute of limitations for claims regarding a continuing wrong does not commence until the cause of the damage is abated.[113] "Courts typically find torts to be continuous in nature where each individual act would not necessarily give rise to a cause of action but the cumulative effect of regularly occurring or continuous actions results in successive damages from day to day."[114] The continuing violation doctrine applies when the "unlawfulness of [the] defendant's actions becomes apparent only after the cumulation of a series of related events," and "it does *not* apply to a series of related but discrete, discriminatory acts."[115]

The Court is persuaded that the "continuing violation" doctrine applies in this case. Spikes' injuries continued to degenerate throughout the course of his incarceration each day Defendants failed to provide him with medically necessary care. In fact, the Court's order rejecting Defendants' assertion of qualified immunity was based largely on the

---

[111] *Id.*
[112] R. Doc. 1.
[113] *See Neel v. Rehberg*, 577 F.2d 262, 263–64 (5th Cir. 1978); *Brown v. Foti*, No. 92-2728, 1993 WL 149858, at *3 n.27 (E.D. La. April 30, 1993).
[114] *Griffith v. City of New Orleans*, No. 11-245, 2013 WL 5592937, at *3 (E.D. La. Oct. 10, 2013) (citing *Hunter v. Tensas Nursing Home*, 743 So. 2d 839, 842 (La. App. 2 Cir. 1999)).
[115] *Brooks v. Menifee*, No. 07-0131, 2010 WL 7827470, at *3 (W.D. La. Sept. 27, 2010), *as adopted by*, No. 07-0131, 2011 WL 5117600 (W.D. La. Oct. 26, 2011).

allegation that Defendants acted with deliberate indifference when they ignored Spikes' severe medical needs for nearly nine months.[116] The Court's finding of deliberate indifference is inextricably linked with the fact that Spikes suffered unnecessarily *because* of the unreasonably prolonged period of time Defendants allowed Spikes to suffer with a severe medical need. As the U.S. Court of Appeals for the Seventh Circuit explained in *Heard v. Sheahan*:

> Every day [the defendants] prolonged [the plaintiff's] agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew. . . . [A]ll the pain after the date of onset, as it were, of deliberate indifference was fair game for the plaintiff's suit, by virtue of the doctrine of "continuing violation." . . . This is a general principle of federal common law; it is not anything special to section 1983.[117]

That Spikes at one point underwent surgery to repair his hip does not alter the Court's analysis.[118] Looking to the Complaint's factual allegations, Defendants were indifferent to Spikes' hip injury in their failure to properly diagnose and treat him, as well as when they failed to provide Spikes with the proper post-operative treatment. Defendants' indifference to Spikes' hip injury continued well after he underwent surgery at UMC, prolonging his pain unnecessarily and exacerbating his injury.

Because Spikes' claims are based on a "cumulation of a series of related events," as opposed "to a series of related but discrete, discriminatory acts,"[119] the prescriptive period for Spikes' § 1983 claims began to run only once the continuing cause of the harm abated,

---

[116] R. Doc. 40 at 18–20.
[117] 253 F.3d 316, 318 (7th Cir. 2001).
[118] *Barnes v. Corizon Health, Inc.*, 13-862, 2014 WL 3767583, at *8 (M.D. Ala. July 31, 2014) (finding the plaintiff had established a continuing claim despite the intermittent provision of necessary medication); *Brown*, 1993 WL 149858, at *3 & n.27 (finding Plaintiff had alleged a continuing tort, despite having received intermittent medical treatment).
[119] *Brooks*, 2010 WL 7827470, at *3.

which, in this case, was well after August 23, 2016.[120] As a result, Spikes' § 1983 claims were timely filed on August 23, 2017, and the Court **DENIES** Defendants' motion to dismiss based on prescription.

Accordingly;

## CONCLUSION

**IT IS ORDERED** that Defendants Dr. Casey McVea, Lesley Wheat, Wendy Seal, R. Bowman, and Paula Stringer's motion to dismiss is **GRANTED** in part and **DENIED** in part.[121] With respect to Plaintiff's claims against Defendants in their individual capacities based on Louisiana Civil Code article 2315, the motion is **GRANTED**. With respect to Plaintiff's claims based on conduct that occurred prior to August 23, 2016, the motion is **DENIED**.

**IT IS ORDERED** that Plaintiff's state law claims against Defendants be and hereby are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 6th day of July, 2018.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[120] *See* R. Doc. 21 at ¶¶ 29–31. Presumably, the violation of Spikes' Eighth Amendment rights continued until his release from Rayburn. *See Brown*, 1993 WL 149858, at *3. In his complaint, Spikes does not note when he was released; however, the latest date on which Spikes specifically alleges he received constitutionally deficient medical treatment is October 27, 2016, when he "returned to Rayburn with the orders to allow continued use of the straight cane as needed and to continue physical therapy to promote full return of range of motion and strength to his hip," but that Defendants "failed schedule a follow up appointment to return [him] to the orthopedic clinic" and "failed to schedule and maintain physical therapy appointments." R. Doc. 21 at ¶¶ 29–31. Thus, the earliest date on which Spikes' causes of action could have begun to accrue is October 27, 2016; therefore, Spikes' Complaint filed August 23, 2017 is timely.
[121] R. Doc. 41.