## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LARCE SPIKES,** | **CIVIL ACTION** |
| **Plaintiff** | |
| | |
| **VERSUS** | **NO.  17-8164** |
| | |
| **DR. CASEY MCVEA, ET AL.,** | **SECTION: "E"(2)** |
| **Defendants** | |

### ORDER AND REASONS

Defendants Dr. Casey McVea,[1] Paula Stringer, Robin Bowman, Wendy Seal, and Lesley Wheat filed a motion for summary judgment[2] asserting, *inter alia*, their right to the defense of qualified immunity as to Count 3 of Plaintiff Larce Spike's amended complaint.[3] Plaintiff filed an opposition.[4] Defendants filed a reply,[5] and Plaintiff filed a sur-reply.[6]

On December 27, 2018, the Court granted in part and denied in part the motion for summary judgment on the right to qualified immunity with respect to Count 3 of Plaintiff's amended complaint.[7] The Court granted summary judgment "with respect to all Defendants' defense of qualified immunity to count three for their deliberate indifference to Plaintiff's post-operative" medical needs.[8] The Court, however, denied summary judgment on the defense of qualified immunity raised by Dr. Casey McVea,

---

[1] Dr. Casey McVea passed away in April 2020. The heirs of Dr. Casey McVea—specifically, Conrad McVea, III, Janet McVea Williams, and Jacob O. McVea (collectively "McVea heirs")—were substituted as defendants in place of Dr. Casey McVea. *See* R. Docs. 139, 140. References herein to the "Defendants" are to the McVea heirs, Paula Stringer, Robin Bowman, and Lesley Wheat.
[2] R. Doc. 74.
[3] R. Doc. 21.
[4] R. Doc. 84.
[5] R. Doc. 102.
[6] R. Doc. 105.
[7] R. Doc. 113.
[8] *Id.* at pp. 29–30.

Paula Stringer, Robin Bowman and Lesley Wheat with respect to Plaintiff's claims that the Defendants were deliberately indifferent to his serious pre-operative medical needs.[9] Specifically, the Court denied summary judgment on the ground that there are genuine issues of material fact with respect to whether the Defendants subjectively were aware before his operation that Plaintiff faced a serious risk of medical harm and were deliberately indifferent to his serious medical needs.[10]

On or about January 9, 2019, Defendants took a collateral order appeal to the United States Court of Appeals for the Fifth Circuit from this Court's denial of Defendants' motion for summary judgment on Count 3 of Plaintiff's amended complaint with respect to their pre-operative conduct.[11] On August 11, 2021, the Fifth Circuit issued an opinion affirming this Court's denial of summary judgment on Count 3 and remanding for further proceedings consistent with its opinion.[12] The Fifth Circuit held that Plaintiff "produced sufficient evidence for a jury to find that medical personnel knew their initial diagnosis of a strain was wrong, and that in persisting in their treatment, they were deliberately indifferent to the risk of leaving a fractured hip untreated, conduct violative of the Eighth Amendment."[13] The Fifth Circuit further held that the right violated was clearly established under Fifth Circuit precedent establishing that "delays in treatment, marked

---

[9] *See id.*

[10] *Id.* at pp. 19–20, 23–24.

[11] R. Doc. 120. Count three of Plaintiff's amended complaint asserts claims under 42 U.S.C. § 1983 against all Defendants for being deliberately indifferent to Spikes' serious preoperative and postoperative medical needs. R. Doc. 21 at ¶¶ 50-55. Plaintiff made claims against Wendy Seal under § 1983, related only to post-operative care, and under Louisiana Civil Code article 2315 for negligent and intentional conduct resulting in injury to Plaintiff. (R. Doc. 21 at ¶ 56). On July 6, 2018, the Court dismissed Plaintiff's claims under Louisiana Civil Code article 2315 (R. Doc. 46). On December 27, 2018, the Court granted summary judgment in favor of the Defendants on all claims related to Plaintiff's post-operative care. (R. Doc. 113). As a result, no claims remain against Wendy Seal, and she did not join in the appeal of the Court's denial of summary judgment on Count 3.

[12] *Spikes v. McVea,* 8 F.4th 428, 430 (5th Cir.), *on reh'g,* 12 F.4th 833 (5th Cir. 2021), *reh'g denied,* No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).

[13] *Id.* at 431.

by plainly unresponsive care, rise to the level of deliberate indifference. In light of these precedents, Defendants had fair warning that their delay in treating Spikes's fractured hip beyond the most cursory care violated his Eighth Amendment rights."[14]

On August 25, 2021, after the death of Dr. Casey McVea, Nurses Stringer, Bowman, and Wheat filed a petition for rehearing en banc.[15] In the petition for rehearing, Nurses Stringer, Bowman, and Wheat argued the panel opinion conflicts with Supreme Court precedent that qualified immunity must be evaluated separately for each individual defendant, and conflicts with Supreme Court precedent on the interpretation of an inmate's Eighth Amendment right to be free of deliberate indifference to his serious medical needs.[16]

Treating the petition for rehearing en banc as a petition for panel rehearing, on September 14, 2021, under 5th Circuit Rule 35 Internal Operating Procedures, the Fifth Circuit panel granted the petition for rehearing.[17] In granting the petition, the panel stated as follows:

> The recent death of the doctor makes it all the more important that the inquiry of qualified immunity not rest on the collective action of the medical staff, but on the role of each participant. Accordingly, we GRANT the petition for rehearing, VACATE the judgment below, and REMAND this case to the district court for further proceedings.[18]

Thereafter, a judgment was entered by the Fifth Circuit consistent with the opinion.[19]

On September 27, 2021 Plaintiff-Appellee Larce Spikes filed a petition for panel rehearing following the grant of panel rehearing to Nurses Stringer, Bowman, and Wheat

---

[14] *Id.* at 440.
[15] *Spikes v. McVea*, Case No. 19-30019, R. Doc. 00515995254 (5th Cir.).
[16] *Id.*
[17] *Spikes v. McVea*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).
[18] *Id.*
[19] *Spikes v. McVea*, Case No. 19-30019, R. Doc. 00516013624 (5th Cir. 2021).

and the resulting vacatur of the district court judgment.[20] On October 13, 2021 the panel entered an opinion denying the Petition for rehearing filed by Plaintiff-Appellee Larce Spikes, stating as follows:

> While we recognize that there may be some repetition in the district court's analysis of whether each defendant is entitled to qualified immunity, it is imperative that the court engage in this analysis on an individualized basis. Accordingly, IT IS ORDERED that the petition for rehearing is DENIED.[21]

The mandate issued on October 21, 2021.[22]

In its December 27, 2018 Order and Reasons, this Court determined,[23] and the Fifth Circuit affirmed in its original opinion,[24] the law is clearly established that prison officials inflict cruel and unusual punishment when they are deliberately indifferent to an inmate's serious medical needs, and that deliberate indifference to an inmate's serious medical needs is objectively unreasonable. On appeal, "Defendants only dispute[d] Spikes's contention that they acted with deliberate indifference."[25] "Defendants [did] not challenge Spikes's contention that his fractured hip posed a substantial health risk."[26]

The remand to this Court directs it to determine the qualified immunity of each Defendant on an individual basis.[27] As a result, the Court will now determine, on an individual basis, whether each defendant was deliberately indifferent to Plaintiff's serious

---

[20] *Id.* at R. Doc. 00516031869.

[21] *Id.* at R. Doc. 00516053969.

[22] *Id.* at R. Docs. 00516063480, 00516063481.

[23] R. Doc. 113 at pp. 13–14.

[24] *Spikes v. McVea*, 8 F.4th at 439 (stating that "[Defendants contend] they are entitled to qualified immunity because their actions did not violate clearly established law, given that the facts of this case are no more egregious than in *Estelle v. Gamble*. Defendants are incorrect. . . . [T]his Court has made clear that delays in treatment, marked by plainly unresponsive care, rise to the level of deliberate indifference. In light of these precedents, Defendants had 'fair warning' hat their delay in treating Spikes' fractured hip beyond the most cursory care violated his Eighth Amendment rights.").

[25] *Spikes v. McVea*, 8 F.4th 428, 435 (5th Cir.), *on reh'g*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).

[26] *Id.* at 435 n.21.

[27] *Spikes v. McVea*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).

preoperative medical needs—specifically, whether each defendant had subjective knowledge that Plaintiff faced a serious risk of medical harm and disregarded that risk by failing to take reasonable measures to abate it.

On November 4, 2021, the Court ordered the parties to file supplemental briefing, focusing on the individual preoperative actions of Dr. McVea, Nurse Stringer, Nurse Bowman, and Nurse Wheat.[28] On December 14, 2021, the McVea heirs, Nurse Stringer, Nurse Bowman, and Nurse Wheat filed a supplemental memorandum in support of their motion for summary judgment.[29] On January 20, 2022, Plaintiff filed a supplemental memorandum in opposition to the motion for summary judgment.[30]

The sole issue before the Court on remand is whether Dr. McVea, Nurse Stringer, Nurse Bowman, and Nurse Wheat individually are entitled to qualified immunity as to Plaintiff's claims that each one of them was deliberately indifferent to Plaintiff's serious pre-operative medical needs—that is, whether each one had subjective knowledge, prior to Plaintiff's surgery, that he faced a serious risk of medical harm and whether each one disregarded that risk by failing to take reasonable measures to abate it.[31]

## I.   <u>LEGAL STANDARD</u>

To state a cognizable claim for relief under the Eighth Amendment, a prisoner must satisfy two requirements: "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the

---

[28] R. Doc. 142.

[29] R. Doc. 146.

[30] R. Doc. 147.

[31] Defendants did not seek summary judgment on Count 1 or 2 of Plaintiff's amended complaint. *See* R. Doc. 74. Nevertheless, in Defendants' supplemental brief, they argue Dr. McVea and Nurse Wheat are entitled to qualified immunity on Counts 1 and 2. *See* R. Doc. 146 at p. 27–32. The deadline for filing motions for summary judgment was November 13, 2018. *See* R. Doc. 20 at p. 9. The Court, in its discretion, declines to allow Defendants to raise these qualified immunity defenses now, years after the dispositive motion deadline has passed. *See Edwards v. Cass Cty., Tex.,* 919 F.2d 273, 275–76 (5th Cir. 1990).

minimal civilized measure of life's necessities.'"[32] Second, a plaintiff must establish that the defendant possessed a culpable state of mind.[33] In *Farmer v. Brennan*, the Supreme Court held that the level of culpability required for an Eighth Amendment violation is "subjective recklessness," and that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."[34] "Disregard is evidenced by a prison official's failure to respond reasonably to a known risk."[35] Therefore, a prison official is deliberately indifferent to a prisoner's serious medical needs in violation of the Eighth Amendment "only if  he knows that inmates face a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it."[36]

To elaborate, a prison official cannot be held liable for violating the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[37] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a

---

[32] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation omitted); *see also Cooper v. Johnson*, 353 F. App'x 965, 967 (5th Cir. 2009) (citing *Wilson*, 501 U.S. at 297); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

[33] *Farmer*, 511 U.S. at 834.

[34] *Id.* at 837.

[35] *Spikes v. McVea*, 8 F.4th 428, 435 (5th Cir.), *on reh'g*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).

[36] *Farmer,* 511 U.S. at 847.

[37] *Id.* at 837.

substantial risk from the very fact that the risk was obvious."[38] "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk,"[39] however, "the obviousness of a risk is not conclusive and a  prison official may show that the obvious escaped him."[40] Nevertheless, "a prison official cannot escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."[41] The Supreme Court has advised that "courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known."[42]

"[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[43] "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[44] Such wanton disregard may be evidenced by delays in treatment caused by non-medicals reasons, or by a medical professionals decision to administer easier and less efficacious

---

[38] *Id.* at 842; *see also Estate of Cheney,* 560 F. App'x at 273  (quoting *Id.*) ("Circumstantial evidence may sufficiently establish the subjective recklessness standard because '[w]e may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.'").

[39] *Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir. 1994) (citing *Farmer,* 511 U.S. at 843 n.8). *See also Easter v. Powell,* 467 F.3d 459, 463 (5th Cir. 2006).

[40] *Farmer*, 511 U.S. at 843 n.8.

[41] *Id.*

[42] *Id.*

[43] *Farmer*, 511 U.S. at 837; *see also Estate of Cheney*, 560 F. App'x at 273.

[44] *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quoting *Easter*, 467 F.3d at 465); *see also Bohannan v. Doe*, No. 12-10231, 2013 WL 2631197, at *6 (5th Cir. June 12, 2013) (citing *Gobert*, 463 F.3d at 346).

treatment without exercising professional judgment.[45] Negligence in diagnosing an injury and misdiagnosing an injury does not constitute deliberate indifference; however, "an official's failure to respond upon learning his diagnosis is incorrect does."[46]

"[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."[47] "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."[48]

Nurses who act as gatekeepers to a physician may act with deliberate indifference when they deny a prisoner access to a medical professional competent to diagnose and treat his condition.[49] A nurse who acts as a "gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care."[50] For example, the Fifth Circuit has upheld a finding that a nurse defendant acted with deliberate indifference when she failed to refer an inmate to the prison's medical doctor despite his complaints of extreme abdominal pain and bilious vomiting for over a week.[51] Nurses may also act with deliberate indifference "[w]hen the need for treatment is obvious" and the medical care they provide is "so cursory as to amount to no treatment at all."[52] For example, the Eleventh Circuit upheld a finding of deliberate indifference when,

---

[45] *Spikes v. McVea,* 8 F.4th 428, 435 (5th Cir.), *on reh'g,* 12 F.4th 833 (5th Cir. 2021), *reh'g denied,* No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).
[46] *Spikes v. Mcvea,* 8 F.4th at 438.
[47] *Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted).
[48] *Gobert,* 436 F.3d at 346.
[49] *Rodrigue v. Morehouse Det. Ctr.,* No. CIV.A. 09-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012), *aff'd sub nom. Rodrigue v. Grayson*, 557 F. App'x 341 (5th Cir. 2014).
[50] *Id.*
[51] *Id.*
[52] *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)).

despite the inmate's repeated complaints of increasing pain and extreme discomfort, nurses misdiagnosed his broken hip as muscle inflammation and treated it with muscle relaxants and bed rest for three months.[53]

The ordinary summary judgment standard, and the burden shifting attendant thereto, changes when qualified immunity is involved.[54] Once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is not available. To successfully carry the burden and defeat summary judgment, the plaintiff must show there is a genuine dispute of material fact and a jury could return a verdict in favor of the plaintiff on each of the two following issues: (1) "that the defendant's conduct amounts to a violation of the plaintiff's constitutional rights; and (2) the defendant's actions were 'objectively unreasonable in light of clearly established law at the time of the conduct in question.'"[55] All inferences are drawn in the plaintiff's favor.[56] The court's inquiry is properly focused on whether each defendant had fair warning his or her specific acts were violative of the plaintiff's constitutional rights.[57] If the issue of qualified immunity is not decided before trial, the defense of qualified immunity may be submitted to the fact finder, who must then determine the objective legal reasonableness of the public official's conduct by construing the facts in dispute.[58] "[I]f . . . there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question."[59]

---

[53] *Mandel*, 888 F.2d at 785-87.

[54] *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020).

[55] *Estate of Cheney v. Collier*, 560 F. App'x 271, 273 (5th Cir. 2014) (quoting *Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012)). *See Joseph on behalf of Est. of Joseph v. Bartlett,* 981 F.3d 319, 330 (5th Cir. 2020).

[56] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted).

[57] *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020).

[58] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

[59] *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993).

The appellate court's normal scope of review of the district court's summary judgment ruling also is changed when qualified immunity is involved.[60] As aptly explained by the Fifth Circuit in *Joseph on behalf of Est. of Joseph v. Bartlett*, appellate courts

> only review a denial of summary judgment based on qualified immunity to the extent that it turns on an issue of law. Both steps—the constitutional merits and the clearly established law inquiry—are questions of law. That means we do not second-guess the district court's determination that there are genuine disputes of material fact, as we otherwise might. When the district court identifies a factual dispute, as it did here, we consider only whether the district court correctly assessed the legal significance of the facts it deemed sufficiently supported for purposes of summary judgment. But we do not evaluate whether the district court correctly deemed the facts to be sufficiently supported; that is, whether the evidence in the record would permit a jury to conclude that certain facts are true. In short, we may evaluate whether a factual dispute is material (i.e., legally significant), but we may not evaluate whether it is genuine (i.e., exists).[61]

## II.   ANALYSIS OF CONDUCT OF EACH DEFENDANT

### A.   Nurse Stringer is not entitled to summary judgment on her defense of qualified immunity with respect to her preoperative conduct.

On June 30, 2016 Plaintiff injured himself while "walking the yard" at  Rayburn Correctional Center in Angie, Louisiana, after lifting weights to work out his upper body.[62] Plaintiff experienced sudden pain on the inner and outer portions of his leg, which prevented him from picking up his leg.[63] Plaintiff declared an emergency sick call and was escorted to the infirmary in a wheelchair.[64] Plaintiff testified that immediately prior to his

---

[60] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019), *as revised* (Aug. 21, 2019); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020).

[61] *Joseph on behalf of Est. of Joseph*, 981 F.3d at 331.

[62] R. Doc. 74-1 at 4; R. Doc. 86-1 at 2. *See also* R. Doc. 74-10 at 49-52.

[63] R. Doc. 74-1 at 3; R. Doc. 86-1 at 2.

[64] R. Doc. 74-1 at 4; R. Doc. 86-1 at 2. The parties dispute whether two of Plaintiff's friends, Lamont Richardson and "Cadillac," escorted him to the infirmary or whether only "Cadillac" escorted him. This fact is not material.

initial infirmary visit on June 30, 2016, he experienced a sudden, excruciating pain that felt like he had been hit with a hammer.[65]

Plaintiff claims Nurse Paula Stringer violated his "clearly established right to medical care."[66]Nurse Stringer assessed Plaintiff on June 30, 2016.[67] Nurse Stringer inquired as to the circumstances surrounding Plaintiff's injury and he explained his leg started hurting badly during his post-workout walk. Nurse Stringer proceeded to record his vital signs, check him for a hernia, and note his complaint of pain in his right groin area.[68] Plaintiff testified at his deposition that Nurse Stringer touched his leg and his leg "jumped" when she touched it.[69] Plaintiff further testified that after he explained the circumstances of his injury to her, Nurse Stringer informed him that he had probably pulled a muscle.[70] Nurse Stringer testified at her deposition that she gave Plaintiff Tylenol and muscle rub pursuant to the standing order for muscle strain.[71] Nurse Stringer completed a Healthcare Request Form for the doctor to review on his next working day, which was July 5, 2016, due to the intervening holiday weekend.[72]

The parties dispute whether Nurse Stringer accurately reported the severity of Plaintiff's pain and his complaints that day.[73] The Healthcare Request Form completed by Nurse Stringer documents that Plaintiff came to the infirmary in a wheelchair, complaining of pain to his right groin after lifting weights.[74] The Healthcare Request Form

---

[65] R. Doc. 86-2 at 2; *see also* R. Doc. 86-4 at 51-54.
[66] R. Doc. 147 at p. 10.
[67] R. Doc. 74-1 at 4; R. Doc. 86-1 at 2.
[68] *See* R. Doc. 74-4 at p. 40−45; *see also* R. Doc. 74-11 at p. 169.
[69] R. Doc. 74-10 at p. 83.
[70] *Id.* at p. 58.
[71] R. Doc. 74-4 at pp. 43−44.
[72] R. Doc. 74-1 at 5; R. Doc. 86-1 at 3.
[73] R. Doc. 74-1 at 5-6; R. Doc. 86-1 at 2; *see also* R. Doc. 86 at 1-2.
[74] R. Doc. 74-11 at p. 169. R. Doc. 74-1 at 5; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 13. Plaintiff disputes whether this form accurately reflects his complaints and the nurse's assessment.

also contains Nurse Stringer's note that there was no apparent hernia, and her assessment of the complaint as a muscle strain.[75] During her deposition, Nurse Stringer was asked how she determined there was no apparent hernia in Plaintiff's groin, and Nurse Stringer testified "there was no mass when I touched—I would assume, when I touched him that there was no mass felt."[76] When asked whether she specifically recalled touching Plaintiff's right hip area and groin area to examine for a hernia, she testified that touching the area is "what [she] would formally [sic] do if [she] was looking for a hernia . . . but, him particularly, I can't recall that."[77] Under the "plan" section of the Healthcare Request Form, Nurse Stringer noted that Plaintiff would be given 200 mg of ibuprofen for five days, and she referenced Dr. McVea's standing order.[78] Nurse Stringer testified her reference to Dr. McVea's standing order was to the standing order applicable to muscle strains, and that the standing order determined the course of treatment for the injury.[79]

The parties dispute Plaintiff's level of pain and his ability to ambulate during the period from his initial infirmary visit with Nurse Stringer on June 30, 2016 and his next infirmary visit on July 5, 2016.[80] With respect to whether Plaintiff could ambulate, Defendants state it is an undisputed fact Plaintiff "was still able to stand up and still able to make his bed but tried to avoid walking on his leg due to the pain."[81] In his statement of contested facts, Plaintiff disputes this contention, stating that he "did not avoid walking, he could not walk."[82] In support of his contention that he could not walk, Plaintiff

---

[75] R. Doc. 74-11 at p. 169.
[76] R. Doc. 74-1 at 5; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 13.
[77] *Id.* at 42.
[78] *Id.* R. Doc. 74-1 at 5; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 13.
[79] R. Doc. 74-4 at pp. 43–44.
[80] R. Doc. 74-1 at 5-6; R. Doc. 86-1 at 2-3.
[81] R. Doc. 74-1 at p. 5, ¶ 25 (citing R. Doc. 74-10 at p. 64); R. Doc. 74-2 at 10.
[82] R. Doc. 86-1 at p. 3, ¶ 25.

cites to his testimony during his deposition that he could not walk at all during those five or six days, and that he lay in bed that entire time.[83] Plaintiff further testified he could make his bed during this period only because he was able to stand up and sit back down on one leg.[84] With respect to his level of pain, Defendants contend it is an undisputed fact Plaintiff's pain did not change between his June 30 visit and his July 5 visit.[85] In his statement of contested facts, Plaintiff disputes this and contends his pain grew worse during this time.[86] In his deposition, Plaintiff testified the pain did not improve, but actually got worse, during the period from June 30 to July 5.[87]

Plaintiff visited the infirmary a second time on July 5, 2016 and was again examined by Nurse Stringer.[88] Nurse Stringer testified at her deposition that the Healthcare Request Form from Plaintiff's June 30, 2016 visit would have been included in Plaintiff's chart, and that she would have looked at the June 30, 2016 Health Care Request Form during Plaintiff's July 5, 2016 visit.[89]

The parties dispute whether Plaintiff could walk and whether Plaintiff had full range of motion in his leg during the July 5, 2016 infirmary visit.[90] The Healthcare Request Form filled out by Nurse Stringer contains Nurse Stringer's note that Plaintiff came to the infirmary in a wheelchair continuing to complain of right groin pain, moving to his lateral thigh.[91] Nurse Stringer also noted in the form that Plaintiff complained of

---

[83] R. Doc. 74-10 at 63–64.
[84] R. Doc. 74-10 at 64.
[85] R. Doc. 74-1 at p. 5, ¶. 26; *compare* R. Doc. 86-1 at ¶ 26.
[86] R. Doc. 86-1 at p. 3, ¶ 26.
[87] R. Doc. 74-10 at p. 62–63.
[88] R. Doc. 74-1 at 5; R. Doc. 86-1 at 3. Plaintiff disputes the assertion that he made the same complaint of pain on July 5, 2016 on the basis that his pain was worse that day. Plaintiff does not dispute that he visited the infirmary that day and was treated by nurse Stringer. *See also* R. Doc. 86-2 at 2.
[89] R. Doc. 74-4 at pp. 50–51.
[90] R. Doc. 74-1 at ¶ 27; R. Doc. 86-1 at ¶ 27.
[91] R. Doc. 74-11 at 168; R. Doc. 86-3 at 12.

increased pain when ambulating but was able to ambulate to the scale without assistance and had full range of motion to his right extremity.[92] Plaintiff argues this record does not accurately reflect his condition at the July 5, 2016 visit because Nurse Stringer did not watch Plaintiff ambulate to the scale or examine him to determine whether he had full range of motion.[93] Plaintiff testified he did not walk to the scale but instead rolled his wheelchair near the scale and jumped up onto the scale.[94] Specifically, Plaintiff testified he "couldn't walk. They tried to get me to weigh myself. I dragged myself to the weight – to weigh myself. I dragged myself and hold onto the thing. I jumped up there on one leg because this leg is literally just, like, dead."[95] During her deposition, Nurse Stringer could not recall whether she actually observed Plaintiff walk to the scale or how she determined he had full range of motion.[96] When asked if anyone was looking at him as he walked to the scale, Plaintiff testified, "no."[97] The parties also dispute whether Nurse Stringer accurately documented Plaintiff's level of pain during his July 5, 2016 visit.[98] Nurse Stringer noted on the form that Plaintiff complained of increased "pain when ambulating" during his July 5 visit, but Plaintiff testified his pain was generally worse at the time of this visit.[99] Plaintiff did not testify that his pain was only worse when walking.[100]

Nurse Stringer testified she completed the Healthcare Request Form associated with Plaintiff's July 5, 2016 visit.[101] Nurse Stringer included the notation "chart to MD," on the form, and she explained in her deposition that this meant Plaintiff's chart would

---

[92] R. Doc. 74-11 at 168; R. Doc. 74-4 at p. 47. R. Doc. 86-3 at 12.
[93] R. Doc. 86 at 2-4.
[94] R. Doc. 86-4 at 85.
[95] *Id.*
[96] R. Doc. 74-4 at 48-49.
[97] R. Doc. 86-4 at 85.
[98] R. Doc. 74-10 at pp. 62–63.
[99] R. Doc. 86-4 at p. 63.
[100] *See id.*
[101] R. Doc. 74-4 at p. 46.

be referred to Dr. McVea for him to determine how to assess the Plaintiff's complaint of increased pain.[102] The "healthcare practitioner notes" section of the form, filled out by Dr. McVea, notes the ibuprofen was increased to 400 mg and indicates no further medical intervention required for muscle strain.[103] Nurse Stringer also gave Plaintiff bed rest for a day after the July 5, 2016 infirmary visit.[104]

Defendants state it is undisputed Nurse Stringer forwarded the Healthcare Request Form from the July 5 infirmary visit to Dr. McVea, and that Nurse Stringer continued to follow the standing order regarding muscle strains.[105] Plaintiff does not dispute these facts.[106]

It is undisputed that nurses may call a doctor at any time for immediate assistance if the nurse perceives that an inmate is having a life-threatening emergency such as a heart attack or stroke,[107] and that the doctor is responsible for classifying non-life-threatening concerns as either urgent or routine for purposes of scheduling inmates for doctor's appointments.[108] The parties dispute whether, considering Plaintiff's medical condition and the facts of which Nurse Stringer was aware, Nurse Stringer could have taken action to expedite Plaintiff's appointment with the doctor.[109] Plaintiff argues Nurse Stringer was deliberately indifferent to his serious medical needs because, inter alia, she "failed to take the available steps to urgently refer [Plaintiff] to a physician" and did not refer Plaintiff "for expedited assistance, despite having the ability to make that referral."[110]

---

[102] R. Doc. 74-4 at p. 50.
[103] R. Doc. 74-11 at 168; R. Doc. 86-3 at 12.
[104] R. Doc. 74-10 at p. 64.
[105] R. Doc. 74-1 at p 6, ¶ 27.
[106] R. Doc. 86-1 at p. 3, ¶ 27.
[107] R. Doc. 74-1 at 2; R. Doc. 86-1 at 2.
[108] R. Doc. 74-1 at ¶ 10; R. Doc. 86-1 at ¶ 10.
[109] R. Doc. 74-1 at 2; R. Doc. 86-2 at 4-7.
[110] R. Doc. 147 at p. 11.

Defendants argue Nurse Stringer did refer Plaintiff and his complaints to Dr. McVea after each of her assessments, but admit that Nurse Stringer "did not refer [Plaintiff] for immediate assistance because there was no open and obvious emergency that would indicate such a referral was necessary."[111]

In her deposition, Nurse Stringer was asked about the priority system "of scheduling offender health concerns according to levels of appropriate intervention, i.e. emergent, urgent, routine."[112] Specifically, Nurse Stringer was asked who decides whether a health concern is emergent, urgent, or routine, and Nurse Stringer testified that Dr. McVea would be the one to indicate whether a matter was routine or urgent,[113] but that, if there was an emergent situation and the doctor wasn't available, the nurse would call the doctor, inform him of the situation, and follow the doctor's orders.[114] Nurse Stringer was asked during her deposition whether she routinely noted in her charting when she had a particular concern about a patient needing to be seen by a physician on a faster than routine basis:

> Q: . . . So, you've seen this patient. There's something that is not quite the level of an emergency heart attack where they've got to go to the hospital right now, but it's also they should see the doctor sooner rather than later, would you note that anywhere? So I would guess it falls within that urgent category. Would you note that you had a concern that this patient needed to be seen urgently?
>
> A: No.
>
> Q: No? Okay. But the action that you would take would be to call the doctor; is that correct?
>
> A: Correct.[115]

---

[111] R. Doc. 146 at pp. 8–9.
[112] R. Doc. 74-4 at p. 32.
[113] *Id.*
[114] *Id.* at 33.
[115] *Id.* at 36–36.

Accepting that Nurse Stringer believed Plaintiff's symptoms were consistent with a muscle strain on his first trip to the infirmary, it may be inferred from the circumstances that she became aware on his second visit that his condition was far more serious than her initial assessment indicated. In short, a jury could find that the diagnosis of a sore muscle cannot be squared with Plaintiff's continued inability to walk and failure to respond to ibuprofen and muscle rub.

In similar cases, the Fifth Circuit has recognized that an official is deliberately indifferent to a prisoner's serious medical needs when the official delays treatment with responses so cursory or minimal that they cause unnecessary suffering.[116] Plaintiff's obvious health risk was met with cursory treatment and delayed access to needed medical care, conduct that could rise to the level of deliberate indifference. While Nurse Stringer's response to Plaintiff's first visit to the infirmary did not rise above negligence, the same cannot be said of her response to his second visit to the infirmary. After Nurse Stringer became aware Plaintiff suffered from more than a muscle strain, because he was unable to walk, she neither changed his treatment nor referred him to Dr. McVea for a more immediate examination or further tests. Moreover, accepting Plaintiff's version of the facts as true, a jury could conclude Nurse Stringer knowingly relayed false, or at a minimum, unverified, information about Plaintiff's symptoms to Dr. McVea: she wrote in her note that Plaintiff had full range of motion in his right lower extremity, although Plaintiff swears he was unable to walk or bend his leg at the time. Despite Plaintiff's worsening condition, Nurse Stringer did not record his most obvious symptoms or

---

[116] *See Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003); *Harris v. Hegmann*, 198 F.3d 153, 155, 159–60 (5th Cir. 1999) (per curiam); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam). *See also*., *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989).

recommend an urgent call out. This conduct evinces a wanton disregard for Plaintiff's medical needs.

Although Nurse Stringer denies knowing the risk to Plaintiff, "a factfinder may conclude that [she] knew of a substantial risk from the very fact that the risk was obvious."[117] Accepting all disputed facts in Plaintiff's favor, the Court concludes a jury could find that Plaintiff's prolonged inability to walk and complete lack of response to treatment show that Nurse Stringer was aware of his serious medial risk and was deliberately indifferent to it.

### B. Nurse Bowman is not entitled to summary judgment on her defense of qualified immunity with respect to her preoperative conduct.

Plaintiff made a third emergency sick call on July 6, 2016 and was examined by Nurse Cindi Wallace, who is not named as a defendant in this case.[118] The Healthcare Request Form completed by Nurse Wallace reflects that Plaintiff complained of right groin pain and notes a pulled muscle occurred on June 30, 2016.[119]  The form includes Nurse Wallace's note that Plaintiff came to the infirmary in a wheelchair, had complained of right groin pain since June 30, 2016, and stated, "I can't walk on my leg."[120] Nurse Wallace's note indicates Plaintiff complained of pain in his right hip radiating down his leg to the knee, and that Plaintiff requested crutches.[121] Nurse Wallace records that she discussed the plan of care with the doctor at that time.[122] The "health care practitioner notes" section of the form, completed by Dr. McVea, orders crutches for the next seven

---

[117] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").
[118] R. Doc. 74-11 at pp. 166–67.
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*

days, bottom bunk duty status for the next seven days, and a routine call out.[123] During

his deposition, Dr. McVea testified that his "routine callout" notation meant he was

ordering an appointment for the patient to see the doctor within four to six weeks.[124] The

infirmary activity log reflects that an appointment for Plaintiff to see Dr. McVea was made

sometime after this visit, and Director of Nursing Theresa Knight scheduled Plaintiff's

appointment for August 11, 2016, roughly five weeks later.[125]

Plaintiff visited the infirmary for a fourth time on July 14, 2016 and was assessed

by Nurse Robin Bowman.[126] Plaintiff claims Nurse Bowman violated his "clearly

established right to medical care."[127] The Healthcare Request Form filled out by Nurse

Bowman indicates Plaintiff arrived at the infirmary in a wheelchair, continuing to

complain of severe pain in his right lower leg, from his hip to his thigh, radiating to his

groin.[128] Plaintiff filled out part of the form, writing, "My right leg. I can't stand on it or

be[nd] it."[129] Nurse Bowman physically examined Plaintiff, felt for any deformity, and

noted on the Healthcare Request Form that her touch increased Plaintiff's pain and that

there was possible or questionable swelling in Plaintiff's hip region.[130] Nurse Bowman

indicated on the form that Plaintiff had made four sick calls at that point.[131] After this

appointment, Plaintiff received a temporary no duty status change through July 19, 2016,

and Nurse Bowman noted on the form that Plaintiff had pain medication (ibuprofen 400

---

[123] *Id.*
[124] R. Doc. 86-5 at pp. 58, 140.
[125] R. Doc. 86-3 at pp. 53–56. R. Doc. 86–5 at pp. 150–157. R. Doc. 74-3 at p. 40.
[126] R. Doc. 74-1 at 7; R. Doc. 86-1 at 3.
[127] R. Doc. 147 at p. 15.
[128] Although the parties dispute the steps Nurse Bowman took to transmit the Healthcare Request Form to Dr. McVea for review, the parties do not dispute that Nurse Bowman completed the form. R. Doc. 74-1 at 7; R. Doc. 86-1 at 3. Both parties attach the Healthcare Request Form from Plaintiff's July 14, 2016 visit to their motion/opposition. R. Doc. 74-11 at 165; R. Doc. 86-3 at 10.
[129] R. Doc. 74-11 at 165; R. Doc. 86-3 at 10.
[130] R. Doc. 74-1 at 7; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 10.
[131] R. Doc. 74-11 at 165; R. Doc. 86-3 at 10.

mg) ordered, renewed his muscle rub medication, and changed Plaintiff's duty status to continue to provide for a bottom bunk, a wheelchair for mobility, and bed rest.[132]

Plaintiff visited the infirmary again on July 19, 2016[133] and was again examined by Nurse Bowman.[134] Plaintiff continued to complain of pain to his right hip.[135] Plaintiff filled out part of the Healthcare Request Form, writing, "my right leg, I can't stand on it or bend it to (sic) far."[136] Nurse Bowman noted on the Healthcare Request Form she informed Plaintiff that Dr. McVea was aware of his situation, and that Plaintiff had a routine call out appointment scheduled,[137] though Plaintiff was not informed of the date of his appointment.[138] Nurse Bowman also noted on the form that Plaintiff arrived via wheelchair, that his vital signs were normal, and that he continued to complain of pain in his right hip and leg.[139] Nurse Bowman also documented Plaintiff's request for an extension of his no duty status, noting Plaintiff's statements that he has crutches in the dorm and cannot work in the field.[140] Dr. McVea reviewed the form and marked that Plaintiff already had an appointment scheduled to see him.[141]

---

[132] R. Doc. 86-3 at 3. The parties do not dispute that Plaintiff received this status change, but the parties dispute who ordered the adjustment to his duty assignment. R. Doc. 74-1 at 8; R. Doc. 86-1 at 3.

[133] R. Doc. 74-1 at 7; R. Doc. 86-1 at 3. Defendants submit this visit took place on July 20, 2016. R. Doc. 74-1 at 7. Plaintiff submits this visit took place on July 19, 2016. R. Doc. 86-1 at 3. The medical record is dated July 19, 2016 at the top and July 20, 2016 at the bottom. R. Doc. 74-11 at 164; R. Doc. 86-3 at 9. Since Plaintiff's medical records reveal another entry on July 20, 2016, it appears this visit did indeed take place on July 19, 2016. This disputed fact is not material to the Court's decision.

[134] R. Doc. 74-1 at 8; R. Doc. 86-1 at 3.

[135] *See* R. Doc. 74-11 at 164.

[136] *Id.* R. Doc. 86-3 at 9.

[137] R. Doc. 86-3 at p. 9.

[138] R. Doc. 74-1 at 8; R. Doc. 86-1 at 3. In his deposition, Plaintiff testified during his third or fourth visit to the infirmary, he was informed he had a doctor's appointment scheduled, but that the first time he knew his doctor's appointment was scheduled for August 11, 20216 was in the morning of August 11, 2016. R. Doc. 86-4 at pp. 92–93.

[139] R. Doc. 86-3 at p. 9.

[140] R. Doc. 74-1 at 8; R. Doc. 86-1 at 3.

[141] R. Doc. 74-1 at 8; R. Doc. 86-1 at 4.

Nurse Bowman testified in her deposition that she is familiar with the 'priority system' required by the State of Louisiana Department of Public Safety and Corrections Healthcare Policy HC-01,[142] which is defined as the system of scheduling offender health concerns according to levels of appropriate intervention, i.e., emergent, urgent, or routine.[143] Nurse Bowman testified in her deposition that the director of nursing and the assistant director of nursing take care of making and scheduling doctor appointments for inmates.[144] Specifically, Nurse Bowman testified that the nurse assessing the inmate would "basically make a recommendation for where this would fall in the priority system," but that the assistant director of nursing and director of nursing could change the recommendation when scheduling the inmate for a doctor's appointment.[145] Nurse Bowman further testified the doctor would review the inmate's charts in his basket on the business day following the nurse's assessment of the inmate, and that the doctor could order the nurse to schedule the inmate for an appointment on an expedited basis.[146] Nurse Bowman further explained the doctor had the authority to override any decision or recommendation made regarding the priority ranking system.[147]

It is undisputed that nurses may call a doctor at any time for immediate assistance if the nurse perceives that an inmate is having a life-threatening emergency such as a heart attack or stroke,[148] and that the doctor is responsible for classifying non-life-threatening concerns as either urgent or routine for purposes of scheduling inmates for

---

[142] R. Doc. 74-3 at p. 19.
[143] R. Doc. 86-17 at ¶ 5.B. *See also* R. Doc. 74-8 at p. 2.
[144] R. Doc. 74-3 at p. 19.
[145] *Id.* at pp. 19–20.
[146] *Id.* at p. 21.
[147] *Id.* at pp. 21–22.
[148] R. Doc. 74-1 at 2; R. Doc. 86-1 at 2.

doctor's appointments.[149] The parties dispute whether, considering Plaintiff's medical condition and the facts of which Nurse Bowman was aware, Nurse Bowman could have taken action to expedite Plaintiff's appointment with the doctor.[150] Plaintiff contends Nurse Bowman had subjective knowledge of the risk of harm to him based on his increasing complaints of pain over a three week period, and that Nurse Bowman was aware of the seriousness of his condition, particularly his extreme pain, inability to walk, and the fact that his symptoms had persisted for three weeks by the time Nurse Bowman assessed him on July 19, 2016.[151] Defendants argue there is no evidence Nurse Bowman ever drew the inference that a substantial risk of serious harm existed, and that Nurse Bowman believed Plaintiff was suffering from a continuing, severe muscle strain and not a fracture.[152] During her deposition, Nurse Bowman testified she reviewed the Healthcare Request Forms completed by the nurses who assessed Plaintiff on June 30, 2016, July 5, 2016, and July 6, 2016, as these forms were part of Plaintiff's chart.[153] Nurse Bowman testified during her deposition she recalled Plaintiff coming to the infirmary several times in a wheelchair and stating he could not walk.[154] In the Healthcare Request Forms completed by Nurse Bowman during her assessments of Plaintiff on July 14 and July 19, Nurse Bowman indicates Plaintiff continued to complain of pain to his right hip, leg and groin.[155]

Because Nurse Bowman reviewed the Healthcare Request Forms from Plaintiff's previous infirmary visits, it is clear Nurse Bowman was aware Plaintiff had been using a

---

[149] R. Doc. 74-1 at ¶ 10; R. Doc. 86-1 at ¶ 10.
[150] R. Doc. 74-1 at 2; R. Doc. 86-2 at 4-7.
[151] R. Doc. 147 at p. 13.
[152] R. Doc. 146 at p. 12.
[153] R. Doc. 74-3 at pp. 25–26, 28–29, 31–32, 46.
[154] R. Doc. 74-3 at p. 24.
[155] R. Doc. 74-11 at pp. 165–66.

wheelchair and suffering from persistent hip, leg, and groin pain, which was not improving, from June 30, 2016 to July 19, 2016. Although Nurse Bowman denies knowing the risk to Plaintiff, "a factfinder may conclude that [she] knew of a substantial risk from the very fact that the risk was obvious."[156] That is, Nurse Bowman's knowledge of a risk to Plaintiff beyond a pulled muscle may be inferred from the circumstances. A jury could infer that Nurse Bowman was subjectively aware that treatment for a muscle strain had proven ineffective, and that Plaintiff faced a more serious health risk than a muscle strain. Nurse Bowman treated Plaintiff two weeks after his initial injury, and then again five days later. On both occasions, Plaintiff arrived at the infirmary in a wheelchair, complaining of severe pain and inability to walk, stand on his leg, or bend his leg. After reviewing Plaintiff's chart, Nurse Bowman was aware Plaintiff had travelled to the infirmary several times before, complaining of severe pain and inability to walk.

In similar cases, the Fifth Circuit recognized that an official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses so cursory or minimal that they cause unnecessary suffering.[157] Accepting the facts in Plaintiff's favor, the Court concludes a jury could find that Plaintiff's prolonged inability to walk and complete lack of improvement under the prescribed course of treatment show that the serious risk to his health was obvious. A reasonable jury also could find Plaintiff's obvious health risk was met with cursory treatment and delayed access to needed medical

---

[156] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

[157] *See Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003); *Harris v. Hegmann*, 198 F.3d 153, 155, 159–60 (5th Cir. 1999) (per curiam); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam). *See also.*, *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989).

care, conduct that could rise to the level of deliberate indifference. Nurse Bowman offered Plaintiff only minimal treatment despite compelling evidence he suffered from a fracture. Aware that Plaintiff was unable to walk, and was experiencing unimproved, severe pain for weeks, there is no evidence Nurse Bowman made any attempt to alter Plaintiff's treatment plan of ibuprofen and muscle rub. Nurse Bowman did not contact Dr. McVea to recommend urgent care for Plaintiff's complaints, and did not seek authorization for an X-ray, even though an X-ray was readily available. Finding all disputed facts in Plaintiff's favor, a reasonable jury could conclude that Nurse Bowman's insistence on a course of treatment so plainly unresponsive to Plaintiff's condition demonstrates deliberate indifference to his serious medical needs.

### C.  **Nurse Wheat is not entitled to summary judgment on her defense of qualified immunity with respect to her preoperative conduct.**

Plaintiff sought medical treatment for a sixth time on July 20, 2016 and was examined by Nurse Lesley Wheat.[158] Plaintiff claims Nurse Wheat violated his "clearly established right to medical care."[159] The Healthcare Request Form filled out by Nurse Wheat reflects that Plaintiff arrived at the infirmary in a wheelchair and complained of right groin pain.[160] The form notes Plaintiff was given crutches for one week and was instructed not to participate in sports or weight lifting.[161] As a result of Plaintiff's repeated complaints about the same problem, Nurse Wheat reprimanded Plaintiff for malingering, as Plaintiff had already been seen by nurses and had a scheduled appointment with a

---

[158] R. Doc. 74-1 at 8; R. Doc. 86-1 at 4.
[159] R. Doc. 147 at p. 16.
[160] R. Doc. 74-11 at p. 163.
[161] Although the parties dispute whether Nurse Wheat accurately documented Plaintiff's complaints in the Healthcare Request Form, the parties do not dispute that Nurse Wheat completed the form for this visit. R. Doc. 74-1 at 8-9; R. Doc. 86-1 at 4. Both parties attach the Healthcare Request Form from Plaintiff's July 20, 2016 visit to their motion/opposition. R. Doc. 74-11 at 163; R. Doc. 86-3 at 8.

doctor.[162] Plaintiff was the subject of disciplinary action as a result of this charge of malingering.[163]

It is undisputed that nurses may call a doctor at any time for immediate assistance if the nurse perceives that an inmate is having a life-threatening emergency such as a heart attack or stroke,[164] and that the doctor is responsible for classifying non-life-threatening concerns as either urgent or routine for purposes of scheduling inmates for doctor's appointments.[165] The parties dispute whether, considering Plaintiff's medical condition and the facts of which Nurse Wheat was aware, Nurse Wheat could have taken action to expedite Plaintiff's appointment with the doctor.[166] Defendants argue the evidence shows Nurse Wheat, during her singular examination of the Plaintiff

> followed prison policy, reasonably relied on the notations of the previous visits, and failed to perceive an open and obvious signs of an emergent medical condition after conducting a physical exam. At worst, Nurse Wheat, like Nurses Stringer and Bowman, failed to recognize that Plaintiff had suffered a fracture. At worst, Nurse Wheat took his complaints of groin pain and previous treatment for a muscle strain as signs that he was suffering from the same muscle strain for which he had been previously diagnosed. At worst, Nurse Wheat treated the plaintiff for the incorrect injury by only providing crutches for his use until his appointment with Dr. McVea and ensuring continued pain treatment for what was thought to be a muscle strain. At worst, Nurse Wheat was wrong, but thought she was right. Again, it is critical to note the requirement that an official know of and disregard an excessive risk to inmate health or safety, and draw inference that a substantial risk of serious harm exists. There is no evidence that Nurse Wheat ever drew that required inference.[167]

Plaintiff argues when Nurse Wheat assessed Plaintiff on July 20, 2016, she was subjectively aware Plaintiff had been seeking medical care and complaining of leg pain

---

[162] R. Doc. 74-1 at 9; R. Doc. 86-1 at 4.
[163] *Id.*
[164] R. Doc. 74-1 at 2; R. Doc. 86-1 at 2.
[165] R. Doc. 74-1 at ¶ 10; R. Doc. 86-1 at ¶ 10.
[166] R. Doc. 74-1 at 2; R. Doc. 86-2 at 4-7.
[167] R. Doc. 146 at pp. 15–16.

and immobility since June 30, 2016 and that the medical treatment he received during that period had not improved his condition.[168] Plaintiff argues Nurse Wheat knew of his continuing and intense pain, and that Nurse Wheat's provision of crutches to Plaintiff to address his mobility limitations was not a reasonable response to repeated and prolonged complaints of pain and inability to walk.[169]

In her deposition, Nurse Wheat testified she was familiar with the policy of Rayburn Correctional Center "to render immediate medical assistance and transportation to a local medical facility, if necessary . . . in case of health-related emergencies."[170] Nurse Wheat testified it was up to the physician to determine whether a particular condition amounted to a health-related emergency for purposes of this policy, and, when asked whether a fracture or broken bone would be covered as a health-related emergency, Nurse Wheat responded as follows:

> [i]t would depend on if we had a doctor here or not. I mean, yes, it would be an emergency an emergency, but not necessarily sent out [to a local medical facility] if a physician was here at the time."[171]

Nurse Wheat testified that, with respect to the priority system for scheduling clinical services,[172] the nurses perform the assessment of the inmate, and the doctor determines, based on the nurse's assessment, whether the inmate's healthcare needs are emergent, urgent, or routine.[173] Nurse Wheat further testified the nurse can call the doctor to inform him what is going on if she sees something that is concerning to her, but that it is the

---

[168] R. Doc. 147 at p. 15.
[169] *Id.* at p. 16.
[170] R. Doc. 74-5 at pp. 62–63.
[171] *Id.* at p. 63.
[172] Nurse Wheat testified "clinical services," means "[s]eeing the doctor, telemedicine, the whole sick call process." *Id.* at p. 70.
[173] *Id.* at p. 69.

doctor who categories particular healthcare needs as emergent, urgent, or routine.[174] Nurse Wheat testified emergent concerns would be seen as soon as possible, urgent concerns would be seen within two to four weeks, and routine concerns would be seen within four to eight weeks. Nurse Wheat testified at her deposition she wrote Plaintiff up for malingering because "[h]is complaint [had] been addressed multiples times, so obviously, I saw his chart or knew something, and that he has an appointment with Dr. McVea."[175] This testimony shows Nurse Wheat was aware Plaintiff had inability or, at the least, difficulty, walking for three weeks, as well as continued, non-improving severe pain for three weeks.

Although Nurse Wheat denies knowing the risk to Plaintiff, "a factfinder may conclude that [she] knew of a substantial risk from the very fact that the risk was obvious."[176] That is, Nurse Wheat's knowledge of a risk to Plaintiff beyond a pulled muscle may be inferred from the circumstances. When Nurse Wheat treated Plaintiff three weeks after his initial injury, she knew he had visited the infirmary on five prior occasions, complaining of the same severe pain and inability to walk, and that his condition remained unchanged or worse throughout this period. From these facts, a jury could conclude Nurse Wheat was subjectively aware that treatment for a muscle strain had proven to be ineffective and that Plaintiff faced a more serious health risk.

In similar cases, the Fifth Circuit recognized that an official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses

---

[174] *Id.*
[175] *Id.* at p. 135.
[176] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

so cursory or minimal that they cause unnecessary suffering.[177] Accepting the facts in Plaintiff's favor, the Court concludes a reasonable jury could find that Plaintiff's prolonged inability to walk and complete lack of improvement under the prescribed course of treatment show that Nurse Wheat was aware of his serious medical risk and was deliberately indifferent it. Plaintiff's obvious health risk was met with cursory treatment and delayed access to needed medical care, conduct that could rise to the level of deliberate indifference. Nurse Wheat offered Plaintiff only minimal treatment despite compelling evidence he suffered from a fracture. Aware that Plaintiff was unable to walk, and was experiencing unimproved, severe pain for weeks, there is no evidence Nurse Wheat made any attempt to alter Plaintiff's treatment plan of ibuprofen and muscle rub. Nurse Wheat did not contact Dr. McVea to recommend urgent care for Plaintiff's complaints, and did not seek authorization for an X-ray, even though an X-ray was readily available. A reasonable jury could find that Nurse Wheat's insistence on a course of treatment so plainly unresponsive to Plaintiff's condition demonstrates deliberate indifference to his medical needs.

### D.  **Dr. McVea is not entitled to summary judgment on his defense of qualified immunity with respect to his preoperative conduct.**

Plaintiff's claims against Dr. McVea are based on Dr. McVea's alleged failure to timely see and evaluate Plaintiff despite his awareness of Plaintiff's ongoing and worsening complaints of pain and decreased mobility.[178] Plaintiff argues Dr. McVea was deliberately indifferent to Plaintiff's medical needs because he was aware of Plaintiff's

---

[177] *See Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003); *Harris v. Hegmann*, 198 F.3d 153, 155, 159–60 (5th Cir. 1999) (per curiam); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam). *See also.*, *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989).
[178] R. Doc. 21 at ¶ 51.

condition and failed to take action to provide the appropriate treatment, and also failed to take steps to schedule an appointment on an expedited basis or order more diagnostic testing.[179] Specifically, Plaintiff argues Dr. McVea was subjectively aware that on six occasions Plaintiff reported "being in significant pain that had not abated and that [Plaintiff] continued to request emergency medical care for his hip because the treatment was not working."[180] Plaintiff further argues Dr. McVea should have known Plaintiff was suffering something worse than a muscle strain because Dr. McVea himself testified that he would expect a muscle strain to begin to improve within a week or two, and that Plaintiff's symptoms persisted much longer than two weeks.[181] Defendants argue Dr. McVea did not act with deliberate indifference to Plaintiff's medical needs because "the evidence shows that Dr. McVea was, at worst, wrong but thought he was right."[182] Defendants argue Dr. McVea's determination Plaintiff could wait until his appointment to be seen was not deliberate indifference because several factors indicated to him that Plaintiff was not suffering an emergency.[183] Dr. McVea testified that because Plaintiff's pain had not been brought on by a traumatic event, but began when Plaintiff had simply been walking, that "would move fracture further back in my list of diagnoses."[184] Dr. McVea testified he considered the healthcare request forms which indicated that, even though walking increased Plaintiff's pain, he understood Plaintiff could still walk, and that this would also "move fracture further back in my list of diagnoses."[185] Dr. McVea further testified that when someone is in severe pain, "generally you see the blood

---

[179] R. Doc. 86 at 35-39.
[180] R. Doc. 147 at p. 17.
[181] *Id.* R. Doc. 86-5 at pp. 143–145.
[182] R. Doc. 74-2 at 27.
[183] R. Doc. 146 at pp. 18–20.
[184] R. Doc. 86-5 at p. 51.
[185] *Id.*

pressure and the pulse rates go up," and that he did not consider Plaintiff to be in severe pain because the Healthcare Request Forms indicated that Plaintiff's vital signs were "stone cold normal."[186]

In its December 27, 2018 Order and Reasons on the Defendants' motion for summary judgment, the Court analyzed Dr. McVea's claim to qualified immunity with respect to Plaintiff's preoperative medical care as follows:

> The parties dispute whether Dr. McVea had subjective knowledge that Plaintiff faced a substantial risk of harm. Although it is undisputed that Dr. McVea reviewed the Healthcare Request Forms submitted by the nurses,[187] and specifically discussed Plaintiff's course of treatment with Nurse [Wallace] on July 6, 2016,[188] Dr. McVea does not concede that he knew that Plaintiff had not been able to walk or move his leg since his injury on June 30, 2016.

> The parties also dispute whether Dr. McVea could have expedited Plaintiff's appointment after making his initial classification for a "routine" or "urgent" callout.[189] Although it is undisputed that after reviewing Healthcare Request Forms, Dr. McVea decides whether to see inmates immediately or classify the request for an appointment as either an "urgent" or "routine" call out,[190] the parties dispute whether Dr. McVea is responsible for scheduling patient appointments on an expedited basis.[191]

> Plaintiff has demonstrated genuine issues of material fact with respect to Dr. McVea's deliberate indifference.[192] Plaintiff's ability to walk, level of pain, and range of motion following his accident is material to a determination of whether Dr. McVea was subjectively aware of a substantial risk of harm to Plaintiff because the risk of harm was obvious.[193] Dr. McVea's subjective knowledge of Plaintiff's condition is material to a determination of whether he acted with deliberate indifference. Dr. McVea's ability and responsibility to schedule patient appointments on a more expedited basis also is material to a determination of whether Dr. McVea

---

[186] *Id.* at p. 141.
[187] R. Doc. 74-1 at 2; R. Doc. 86-1 at 2.
[188] R. Doc. 74-11 at 166; R. Doc. 86-3 at 11.
[189] R. Doc. 74-1 at 2-3; R. Doc. 86-2 at 5-7.
[190] R. Doc. 74-1 at 3; R. Doc. 86-1 at 2.
[191] R. Doc. 74-1 at 2-3; R. Doc. 86-2 at 5-7.
[192] For summary judgment purposes, Plaintiff must raise a material fact issue concerning each Defendant's subjective deliberate indifference. *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009).
[193] *Easter*, 467 F.3d at 463; *Brewster*, 587 F.3d at 770; *see also Bohannan*, 2013 WL 2631197 at *6 (citing *Gobert*, 463 F.3d at 346).

ignored Plaintiff's complaints or acted in a manner evincing a wanton disregard for Plaintiff's serious medical needs.[194]

The Court may grant a motion for summary judgment on the defense of qualified immunity only if, viewing the facts in the light most favorable to the plaintiff, no reasonable jury could find in favor of the plaintiff.[195] Genuine issues of material fact preclude summary judgment on the qualified immunity of Dr. McVea with respect to Plaintiff's claims against him in count three for failing to timely see and evaluate Plaintiff, failure to provide appropriate treatment, failure to schedule an appointment on an expedited basis, and failure to order diagnostic testing.[196] Summary judgment is denied on these claims.[197]

The Fifth Circuit remanded this case for the Court to ensure that the "the inquiry of qualified immunity not rest on the collective action of the medical staff, but on the role of each participant." The Court has reexamined the actions of Dr. McVea individually and reaffirms its earlier decision with respect to Dr. McVea.

On July 5, 2016, Dr. McVea reviewed the Healthcare Request Form completed by Nurse Stringer after Plaintiff's initial nursing visit on June 30, 2016. As mentioned above, that Healthcare Request Form documents that Plaintiff came to the infirmary in a wheelchair, complaining of pain to his right groin after lifting weights,[198] notes no apparent hernia, assesses the complaint as a muscle strain, and provides treatment of 200 mg of ibuprofen for five days.[199] After reviewing all of the information provided in the assessment, Dr. McVea signed off on this sick call request and added the instruction "RTCPRN" which Dr. McVea explained means, "return to clinic as needed."

---

[194] *Brewster*, 587 F.3d at 770; *see also Bohannan*, 2013 WL 2631197 at *6 (citing *Gobert*, 463 F.3d at 346).
[195] *Carner*, 997 F.2d at 98 (citing *Amoco Prod. Co.*, 969 F.2d at 147–48).
[196] R. Doc. 21 at ¶ 51.
[197] R. Doc. 113 at pp. 19–20.
[198] R. Doc. 74-1 at 5; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 13. Plaintiff disputes whether this form accurately reflects his complaints and the nurse's assessment.
[199] R. Doc. 74-1 at 5; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 13.

On July 6, 2016, Dr. McVea reviewed the Healthcare Request Form completed by Nurse Stringer after Plaintiff's July 5, 2016 nursing visit. The Healthcare Request Form indicates Plaintiff came to the infirmary in a wheelchair continuing to complain of right groin pain, moving to his lateral thigh.[200] The form also notes that Plaintiff complained of increased pain when ambulating but was able to ambulate to the scale without assistance and had full range of motion to his right extremity.[201] After reviewing the Healthcare Request Forum, Dr. McVea increased Plaintiff's pain medication from two hundred to four hundred milligrams, three times daily and extended the prescription for three months.[202] Dr. McVea noted in the "healthcare practitioner notes" section of the form to continue current treatment, and that no further medical_intervention was required for muscle strain.[203]

On July 6 or 7, after Nurse Wallace's examination of Plaintiff for his third emergency sick call request,[204] Nurse Wallace discussed Plaintiff's "plan of care" with Dr. McVea.[205] After this discussion, Dr. McVea ordered that Plaintiff be issued crutches, that his duty status be changed to provide him a bottom bunk, and that Plaintiff be scheduled for a routine callout.[206] Dr. McVea also reviewed the Healthcare Request Form completed by Nurse Wallace, which quotes Plaintiff as stating "I can't walk on my leg" and "I went and walked and now right hip radiating down right leg to knee."[207] Sometime after July

---

[200] R. Doc. 74-11 at 168; R. Doc. 86-3 at 12.

[201] *Id.*

[202] R. Doc. 74-11 at p. 168.

[203] *Id.*

[204] The Healthcare Request Form completed by Nurse Wallace reflects that Plaintiff complained of right groin pain and notes a pulled muscle on June 30, 2016. R. Doc. 74-11 at 166; R. Doc. 86-3 at 11. The form notes Plaintiff came to the infirmary in a wheelchair, complained of right groin pain since June 30, 2016, and stated, "I can't walk on my leg." The form indicates Plaintiff complained of pain in his right hip, radiating down his leg to the knee and requested crutches. *Id.*

[205] R. Doc. 74-11 at 166; R. Doc. 86-3 at 11.

[206] R. Doc. 74-1 at 6; R. Doc. 86-2 at 5.

[207] R. Doc. 74-11 at p. 166. R. Doc. 86-5 at pp. 138–142.

6, 2016, Theresa Knight scheduled Plaintiff's appointment with Dr. McVea for August 11, 2016.[208] It is not clear whether Dr. McVea was subjectively aware of Plaintiff's specific appointment date prior to the date of the appointment. However, because Dr. McVea ordered a routine callout on July 6, 2016, he knew he would not see Plaintiff for approximately another four to six weeks from that date.[209]

On July 18, 2016, Dr. McVea reviewed the Healthcare Request Form completed by Nurse Bowman after Plaintiff's July 14, 2016 visit to the infirmary. The form noted that Plaintiff arrived at the infirmary in a wheelchair, continued to complain of pain in his hip, radiating to his thigh, his lower leg, and his groin, and that Plaintiff could not stand on or bend his right leg. The form also noted that touching the area increased Plaintiff's pain and that there was possible swelling in the hip region. The form further indicated that this visit was Plaintiff's fourth sick call. After Dr. McVea reviewed the chart on July 18, 2016, he once again noted that a routine call out visit had been requested for Plaintiff to see him.

On July 20, 2016, Dr. McVea reviewed the Healthcare Request Form completed by Nurse Bowman after Plaintiff's July 19, 2016 visit to the infirmary. The form noted the following: Plaintiff arrived via wheelchair with continued complaints of pain to his right hip and leg; Plaintiff complained he could not stand on or bend his right left; Plaintiff's vital signs were normal; and Plaintiff requested an extension of no duty status. After he reviewed the form, Dr. McVea noted that Plaintiff already had an appointment scheduled to see him.[210]

---

[208] R. Doc. 74-1 at 7; R. Doc. 86-1 at 3; *see also* R. Doc. 86-3 at 53.
[209] R. Doc. 86-5 at p. 58.
[210] R. Doc. 74-1 at 8; R. Doc. 86-1 at 4.

Later in the day on July 20, 2016, after Plaintiff visited the infirmary again and was assessed by Nurse Wheat, Dr. McVea reviewed the Healthcare Request Form completed by Nurse Wheat. The form provided that Plaintiff's complaints of pain and inability to walk were essentially the same as noted during his prior visits, that his vital signs were normal, and briefly summarized Plaintiff's prior similar complaints.

Dr. McVea finally saw Plaintiff on August 11, 2016 and noted that Plaintiff continued to complain of pain in his groin and hip, along with an inability to bear weight or to flex his hip or extend his knee.[211] Dr. McVea ordered an x-ray, taken that day, which revealed a right proximal femur intertrochanteric fracture, or right hip fracture.[212] Plaintiff was immediately transported to University Medical Center ("UMC") in New Orleans.[213] Doctors at UMC performed an open reduction surgery on August 15, 2016.[214]

Although Dr. McVea denies knowing the risk to Plaintiff, "a factfinder may conclude that [he] knew of a substantial risk from the very fact that the risk was obvious."[215] That is, Dr. McVea's knowledge of a risk to Plaintiff beyond a pulled muscle may be inferred from the circumstances, namely, from the obviousness of Plaintiff's condition. Accepting the facts in Plaintiff's favor, after reviewing the notes submitted by each nurse and discussing Plaintiff's course of treatment with Nurse Wallace, Dr. McVea knew that Plaintiff was in severe pain, unable to walk, and unresponsive to weeks of treatment with ibuprofen and muscle rub. Dr. McVea acknowledged during his deposition that Plaintiff's symptoms were inconsistent with a muscle strain, testifying that a patient's

---

[211] R. Doc. 74-1 at 9; R. Doc. 86-1 at 4.
[212] R. Doc. 74-1 at 10; R. Doc. 86-1 at 4.
[213] *Id.*
[214] *Id.*
[215] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

inability to walk would be indicative of a fracture and that a muscle strain would likely improve after the second week. Thus, a reasonable factfinder could infer from the circumstances that Dr. McVea knew there was a substantial risk of harm to Plaintiff's health that was not being addressed, and that Dr. McVea was deliberately indifferent to the risk.

In similar cases, the Fifth Circuit recognized that an official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses so cursory or minimal that they cause unnecessary suffering.[216] Dr. McVea approved Plaintiff's minimal course of treatment for weeks, despite compelling evidence that Plaintiff suffered a fracture. Aware that Plaintiff was unable to walk for weeks and repeatedly complained of excruciating pain, there is no evidence that Dr. McVea made any attempt to alter Plaintiff's treatment or change Plaintiff's priority for a call out appointment even though he reviewed notes from Plaintiff's six sick calls. A jury could conclude that Dr. McVea's refusal to alter Plaintiff's course of treatment despite the obviousness of Plaintiff's health risk and the lack of improvement, and Dr. McVea's delay in rendering responsive treatment, rises to the level of deliberate indifference.

## CONCLUSION

The factual disputes that remain in this case are not just genuine, they are material, meaning Plaintiff is entitled to put his evidence against Nurse Stringer, Nurse Bowman, Nurse Wheat, and Dr. McVea before a jury. Viewing the facts in Plaintiff's favor, a reasonable jury could find that each Defendant was deliberately indifferent to Plaintiff's

---

[216] *See Galvan v. Calhoun Cty.*, 719 F. App'x 372, 374–75 (5th Cir. 2018); *Rodrigue v. Grayson*, 557 F. App'x 341, 342, 346 (5th Cir. 2014) (unpublished) (per curiam); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003); *Harris v. Hegmann*, 198 F.3d 153, 155, 159–60 (5th Cir. 1999) (per curiam); *Ledesma v. Swartz*, No. 97-10799, 1997 WL 811746, at *1 (5th Cir. 1997) (unpublished) (per curiam). *See also.*, *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017); *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989).

serious medical needs because a jury could find that each Defendant was subjectively aware of a serious health risk to Plaintiff, and that each Defendant effectively ignored Plaintiff's complaints by offering him only cursory medical treatment and by delaying his access to adequate medical care, causing further medical harm to him.

**IT IS ORDERED** that the motion for summary judgment, filed by Defendants Dr. Casey McVea, Paula Stringer, Robin Bowman, and Lesley Wheat, on the issue of their qualified immunity on Count 3 of Plaintiff's amended complaint for their pre-operative conduct is **HEREBY DENIED.**

**New Orleans, Louisiana, this 3rd day of May, 2022.**[217]

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[217] "The district court's decision to deny qualified immunity on a motion for summary judgment is not appealable if it is based on a claim regarding the sufficiency of the evidence. Therefore, if the district court concludes that the summary judgment record raises a genuine issue of material fact with respect to whether qualified immunity is applicable, [as in this case,] then that decision is not immediately appealable." However, the Court of Appeals may accept the Plaintiff's version of the facts as true and consider "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Gobert*, 463 F.3d at 344-45 (internal citations and quotations omitted).